In re Clayton D. MOREAU, a Minor.

William Council and Marilyn Council, Petitioners–Respondents,

v.

Robert Royster, Respondent–Appellant. No. 22991.

Missouri Court of Appeals, Southern District, Division One.

March 31, 2000.

Motion for Rehearing and Transfer Denied April 24, 2000.

Application for Transfer Denied May 30, 2000.

Ronald D. White, Richard W. Wood, Williams, Robinson, White, Rigler & Parker, P.C., Attorneys, for Appellant.

Tyce S. Smith, Sr., Colin P. Long, Smith, Dunbar, Turley, Waynesville, Attorneys, for Respondents.

KENNETH W. SHRUM, Judge.

Robert Royster ("Appellant"), the father of Clayton Dean Moreau ("C.D."), a minor, appeals from an order appointing William and Marilyn Council,[1] husband and wife, as guardians of C.D. Such an order is appealable. *Estate of Williams*, 922 S.W.2d 422, 423 (Mo.App.1996). Mahealani Royster ("Mahealani"), mother of C.D., does not appeal. We affirm.

■ We conduct our review of this case under Rule 84.13(d).[2] Under that rule, we will affirm the trial court's judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, it erroneously declares the law, or it erroneously applies the law. *Matter of T.A.P.*, 953 S.W.2d 638, 639–40[1] (Mo. App.1997).

■ "Due regard is given the opportunity of the trial court to judge the credibility of witnesses." *Williams*, 922 S.W.2d at 423. *See* Rule 84.13(d)(2).[3] Resolving credibility of witnesses is generally left to the trial judge who may disbelieve testimony even when uncontradicted. *Williams*, 922 S.W.2d at 423. The trial judge is in a better position than this court to assess and weigh the credibility of witnesses, i.e., to resolve their sincerity, character, and other trial intangibles that may not be shown by the record. *Id.*

In 1994, sixteen-year-old Mahealani lived with her mother, Marilyn, and her stepfather, William, in North Carolina where William—a career marine—was stationed. Mahealani ran away from home just before she met Appellant, who was also sixteen years old at the time. While on this sojourn, Mahealani became pregnant by Appellant.

After learning she was pregnant, Mahealani returned to live with Respondents and moved with them to William's new duty station in Pulaski County, Missouri. Mahealani gave birth to C.D. in Missouri on September 28, 1995.

Initially, Mahealani did not tell Appellant of her pregnancy or of C.D.'s birth. After C.D. was born, Mahealani gave him to Respondents, who maintained physical custody of and supported C.D. until March 1997.

On November 1, 1996, Respondents asked the Pulaski County Circuit Court to name them as guardians for C.D., alleging that Appellant and Mahealani were unable and unfit to act as parents and guardians. When notified of Respondent's petition, Appellant filed responsive pleadings in which he denied he was unfit and unable to act as parent and guardian for C.D. Appellant affirmatively alleged that his first knowledge of C.D. came in May 1996 by notice from the Missouri Department of Social Services, Division of Family Services, and that he first learned of C.D.'s whereabouts via Respondents' petition for guardianship. On December 18, 1996, the trial court granted Respondents "temporary guardianship" of C.D., with "[r]easonable visitation to [Appellant]."

On January 16, 1997, Appellant and Mahealani were married. The two resided together in North Carolina. In March 1997, Respondents yielded to Mahealani's requests that they deliver C.D. to Appellant and Mahealani in North Carolina for a test visit. At trial, Respondents explained they were trying to "give [them] a chance to [be a] family." Respondents told the

---

1. When referring to William Council or Marilyn Council individually, we call them "William" and "Marilyn." Collectively, we refer to them as "Respondents."

2. All rule references are to Missouri Supreme Court Rules (2000) unless otherwise stated.

3. In *The Matter of T.A.P.* and in *Williams* our standard of review was according to Rule 73.01, the predecessor to Missouri Rule of Civil Procedure 84.13(d) (2000).

young parents they intended to retrieve C.D. before June 23, 1997.

Within two weeks after Respondents took C.D. to North Carolina, Mahealani left Appellant. Evidence regarding what caused her to leave was conflicting. Mahealani testified she left because of Appellant's violent and abusive behavior and continual threats. Appellant testified that Mahealani left to be with Joshua Sipes, with whom she had had an ongoing sexual relationship beginning two months after Appellant and Mahealani were wed. He further testified that she left because he was a "homebody" and "didn't agree with partying." The record reflects that Appellant's and Mahealani's relationship was tumultuous in 1997 and that Mahealani was recurrently in and out of the family home. Appellant testified that during this period, he took care of C.D.

By the time Respondents sought to retrieve C.D. and return him to Missouri in June 1997 as they had originally planned, Appellant had petitioned a North Carolina court for custody of C.D., and Mahealani had signed an affidavit in support of Appellant's effort.

On July 20, 1997, a North Carolina court ruled that Missouri's courts had jurisdiction to decide the custody issue. Respondents then agreed with Appellant that they would wait until September 28, 1997—after C.D.'s birthday—to regain physical custody of C.D. When William went to North Carolina on September 27, 1997, he found that Appellant had fled with C.D. At trial, Appellant admitted that he had hidden the child from law officers and from Respondents until December 1997, at which time he came out of hiding and relinquished physical custody of C.D. to the North Carolina Department of Social Services, which, in turn, returned C.D. to Respondents. Respondents have had physical custody of C.D. since that time except for Appellant's periods of visitation.

**4.** The court, in making findings of fact, repeatedly refers to South Carolina when the record clearly shows the references should be

The guardianship hearing was held March 29, 1999. On April 29, 1999, the trial court found Appellant unfit to take charge of the minor child and granted letters of guardianship to Respondents. The court made extensive findings of fact and conclusions of law, pertinent portions of which are reproduced in the "Appendix." [4] This appeal followed.

Appellant's single point on appeal charges that the "judgment was not supported by substantial evidence, was against the weight of the evidence, and erroneously declared or applied the law in that the evidence did not support a finding that [Appellant] was unfit, unwilling and unable to act as natural guardian of [C.D.]"

 Under §§ 475.030.4(2) and 475.045, RSMo 1994, a parent is to be appointed guardian unless he or she is "adjudged unfit." *Williams*, 922 S.W.2d at 424[2]. The guardianship statutes are consistent with other instances in which child custody is an issue "as there is a rebuttable presumption that it is in the best interest of a minor child to have custody in the parent, but such presumption may be overcome by evidence that the parent is unfit or incompetent to take charge of the child." *Id.* When the evidence is sufficient to support a finding that a parent is "unfit," then the presumption in favor of such parent disappears, and the trial court may properly appoint someone other than the natural parent as guardian. *Id.* at 424.

The term "unfit" is not defined in Missouri's guardianship statutes, but case law has defined the term broadly in the guardianship context.

" '[I]n a contest between one or both parents and a third party "unfitness" must be shown by evidence and found to exist by the court, and that *it amounts to circumstances which justify the court in acting for the best interests and wel-*

to North Carolina. The Appendix must be read accordingly.

*fare of the minor.* "Unfitness" may by its very nature be relative; *in a contest between a relative who has given the children a salutary and stable home life over a period of years, which they prefer and with which the children, the court and the government agency involved are satisfied, on the one hand, and a choice of sending them into an unknown environment where there is a poor performance record for stability and nurture on the other, the latter decision may constitute a great cruelty. Unfitness may refer merely to the degree of care which the parent, with the best intention in the world, is still incapable of fulfilling.* ... In determining such unfitness the stability of the family life may be considered, the amount of care which the custodian will be able to provide for the children on a daily basis, the environment in which they will be brought up, including the presence of family and other interested persons, the efforts, if any, which were made by the parent during this long separation to furnish support to the children, both personal and financial, the mental health or illness of the proposed custodian, and so on.' "

*Williams,* 922 S.W.2d at 425 (emphasis added) (quoting *Lewis v. Lewis,* 154 Ga. App. 853, 269 S.E.2d 919, 921–22 (1980)).

Guided by the passage quoted above in *Williams* and its own findings of fact in this case, as reflected in the Appendix, the trial court concluded that Appellant was "unfit to take charge of [C.D.] as the natural guardian for the following reasons:

"A. [Appellant] does not have the independent ability to provide for the care, health and needs of [C.D.].

"B. The relationship between [Appellant] and [Appellant's father], who is a dominant figure in [Appellant's] life, creates an uncertain and possibly dangerous environment for [C.D.].

"C. [Appellant] is presently physically unfit to care for [C.D.].

"D. During the period when [Respondents] had [C.D] [Appellant] made little effort to provide financial support for [C.D.].

"E. [Appellant] and his family have regard for the rule of law when it supports their wishes and otherwise feel free to break the law when it suits their needs. This creates a moral environment which [is] not conducive to raising [C.D.].

"F. [Appellant] did not see fit to fix the front yard of the trailer or ... arrange for health insurance for [C.D.] until this case brought those matters to his attention.

"G. [Appellant] has stated he will get a better job, pass his GED, place [C.D.] in daycare, get [C.D.] health insurance and do many other things without stating how he will pay for those things or turn his life around. For the foreseeable future [Appellant] intends to stay in his present environment. While having the best intentions, [Appellant] is unable to fulfill his role as natural guardian."

Appellant argues that the reasons expressed by the trial court for finding him unfit "clearly do not meet the standard set forth in *Matter of T.A.P.* ... 953 S.W.2d at 642." Specifically, Appellant refers to the holding in *T.A.P.* that "unfit" can signify "parental neglect" and that "[t]he term neglect has normally focused on physical harm or deprivation, but the term primarily has been seen to involve a failure to perform parental duties imposed by law and by conscience." *Id.* Appellant fixates on this language from *T.A.P.* in urging this court to reverse and insists that there is no evidence that he ever physically harmed or deprived C.D. of anything. Appellant further asserts that "there was insufficient evidence to show a failure by [him] to perform parental duties imposed by law and by conscience."

■ Appellant's argument is flawed in several respects. The trial court's finding that Appellant made little effort to fulfill his duty of providing financial support for C.D. while C.D. was in Respondents' custody is supported by substantial evidence. During the nearly twenty-four months that

Respondents had physical custody of C.D. up to the time of trial,[5] Appellant had sent Respondents only $175 to $225 in support. Aside from this token sum, Respondents bore all the financial costs of caring for C.D. while he was in their custody.

Details of Appellant's earnings and employment are sparse. Appellant testified that he never received W–2's and never filed income tax returns. Nevertheless, the record contains sufficient evidence on this topic to support a finding that Appellant breached his duty to financially support C.D. For example, Appellant adduced evidence that he earned $7,000 "last year" (which we infer to mean 1998) via part-time work in his father's salvage business and supported himself for a "substantial period . . . without substantial assistance" from others. Moreover, Appellant testified that his father was not "his major source of employment for the last four years" as he also worked for "Peele Construction, Robert Smith and Grubbs Construction." Despite this evidence, Appellant adduced no evidence that he used earnings from these employments (other than the $175–$225 sum) to help support C.D. while C.D. was in Respondents' custody. This evidence is analogous to that in *T.A.P.* It suggests that Appellant was indifferent to C.D.'s financial needs while C.D. was in Respondents' custody and that Appellant relegated the performance of his duty to support C.D. to Respondents during those periods. As we concluded in *T.A.P.*, such evidence supports a finding of unfitness within the meaning of the guardianship laws. 953 S.W.2d at 642–43.

■ Appellant's argument is also flawed in its treatment of the definition of "unfit" in *T.A.P.* as singular and exclusive. Other factors enter into the question of "fitness." For instance, the trial court may properly consider the moral environment to which a child will be subjected when deciding whether a parent is unfit to

take custody. *Williams,* 922 S.W.2d at 424[4]. The trial court's conclusion that Appellant and his family use or break the law as it suits their needs, thereby creating an unfavorable moral climate in which to raise C.D., is supported by ample evidence. In part, this evidence is recounted in paragraphs 2 and 10–12 of the Appendix. Such evidence is also found in Appellant's testimony that he accepted Medicaid benefits for himself without reporting his income and drove motor vehicles without a license.

■ The evidence also supports the trial court's finding in paragraph "B," i.e., that Appellant's relationship with his father "creates an uncertain and possibly dangerous environment for" C.D. In paragraph 1 of the Appendix, the trial court described a particularly violent encounter between Appellant and his father. The court also referred to testimony by Mahealani in which she described a pattern of violence between Appellant and his father. Appellant, himself, described his relationship with his father as "unusual" and "not typical." His explanation was, "We're too much alike." Warren Royster ("Warren"), Appellant's father, testified there had been "fights," "disputes," and "altercations" between both of his sons and him. Warren explained that "teenage boys like to test their daddy." The probability of an "uncertain and possibly dangerous environment" is increased by the fact that Appellant and his father both live on the salvage yard owned by Appellant's grandmother, though they occupy different places. In addition, when Appellant has worked for his father, he has worked at the salvage yard. Appellant's grandmother—a proposed caretaker for C.D.—also lives on the salvage yard. Consequently, evidence exists to support the concern that C.D. would often be exposed to "fights," "disputes," and "altercations" between Appellant and

---

**5.** In figuring twenty-four months as the time Respondents had custody of C.D., we have disregarded the time they had custody of C.D. prior to the point that Appellant first became aware that he had a son. Also, we have disregarded the period of time Appellant had custody of C.D., between March 1997 and December 1997.

his father. The trial court did not err in concluding that such an environment renders Appellant unfit.

There is also evidence to support the trial judge's conclusions in paragraphs "A" and "G," i.e., that Appellant was unfit because he lacked the independent ability "to provide for the care, health and needs" of C.D. and that, despite his best intentions, Appellant is "unable to fulfill his role as natural guardian." At the time of trial, Appellant had no income, and he had a badly fractured leg (suffered in a motorcycle wreck) which had been surgically treated with a steel rod implant. Evidence showed that Appellant was totally dependent on his father, mother, and grandmother. For instance, Appellant lived in a mobile home owned by his grandmother. The land where Appellant's mobile home sits is owned by his grandmother and is part of his father's salvage yard. Although Appellant testified repeatedly about his job prospects once his leg healed, there was also evidence that Appellant has attention deficit disorder (ADD) with hyperactivity and a history of "continually going on to something which appears more challenging." Although Appellant's father, Warren, questioned the diagnosis, he conceded that despite his attempts to involve Appellant in the family business, Appellant "has times when he acts like he doesn't care." Warren's explanation is that Appellant gets "bored too easy." Appellant's mother, Brenda McClain, testified that Appellant had behavioral problems while in school and was diagnosed "with ADD." His treatment for that condition included psychiatric consultation and medication. Appellant stopped taking his medication when he quit school at age sixteen. Brenda conceded that she and other family members had helped Appellant financially "from time to time over the years" and that she expected to continue supporting him.

The decision whether a natural parent is unfit to have custody of his or her child must be based on existing conditions; yet, "past conditions, conduct and attitudes which color, indicate, clarify or cast light upon conditions as they now exist constitute the larger concept of the term 'present condition.'" *Matter of C W B*, 578 S.W.2d 610, 614[7] (Mo.App.1979). *See also, In re Interest of M.L.W.*, 788 S.W.2d 759, 762 (Mo.App.1990) (holding that past events often shape the future). Here, Appellant and several of his family members testified that if he regained custody, he could and would meet the needs of C.D. Even so, the evidence supports the trial court's finding that Appellant's professed commitment to perform his parental duties in the future is not demonstrated by his past conduct. As stated above, Appellant provided only a nominal sum for C.D.'s support while C.D. was in Respondents' custody. When Appellant had custody of C.D., it was only by contributions from Appellant's family that Appellant was able to provide for C.D.'s "care, health and needs." The trial court did not err in finding Appellant unfit for these additional reasons.

As noted in *Williams*, 922 S.W.2d at 425, "unfit" is given broad definition in guardianship of minor cases and trial courts have considerable discretion in applying that term. Here, the trial court did not erroneously declare or apply the law. Its conclusion that Appellant was unfit to serve as natural guardian is not against the weight of the evidence. Rather, the finding is supported by sufficient evidence. Appellant's superior right to have guardianship over his son vanished once it was shown he could not care properly for C.D. *Williams*, 922 S.W.2d at 424[2]. There is ample evidence to support the trial court's conclusions that Respondents are of good character, have cared for C.D. in exemplary fashion for most of his life, have provided an excellent nurturing environment for C.D., and that C.D. has bonded with Respondents.

Considering the due deference we must accord the trial court's decision and the limited scope of our review, we cannot hold that the trial court's finding that Appellant

was unfit was erroneous or that letters of guardianship should not issue to Respondents.

We affirm the judgment of the trial court.

CROW, P.J., CONCURS.

PARRISH, J., CONCURS.

(Excerpt from trial court's
Findings of Fact)

1. There are two matters in evidence that cause this Court great concern. The first is a physical encounter between the father and paternal grandfather. As the Court understands the evidence, the father was leaving the area of the paternal grandfather's business with a shotgun. The grandfather ended up pulling a pistol. There are several versions about what happened and why it happened. The following facts seem to be uncontested.:

A. The father took the pistol from the grandfather and struck the grandfather in the head with the pistol.

B. The grandfather was injured and required stitches.

C. While the father was driving away the grandfather shot at and struck the vehicle the father was driving.

D. When asked by the guardian ad litem the question whether he would have fired the pistol at the vehicle if the minor child was in the vehicle the grandfather answered: "I am from South Carolina and I hit what I shoot at."

The father, in his deposition, stated that the grandfather pointed the pistol at him during the altercation. He denied that at trial. The father also indicated that the father is a good shot and hits his target when he fires a gun. The father demonstrated little concern that the firearm was fired at a vehicle which he was driving. The father and grandfather indicate that this incident was a one-time occurrence. The mother of the minor child has described in her testimony a continuing pattern of violence between the father and grandfather. While the court finds that much of the mother's testimony is not credible, the court finds her testimony as to the pattern of violence between the father and grandfather credible. It is simply not credible that absent prior violence an encounter between the two men could escalate to this level and be treated by the participants with such nonchalance.

2. The second factual situation which concerns the court is that the father absconded with the minor child and hid the child with the encouragement and aid of the paternal grandparents. It should be noted that the father's version of the violent encounter with his father was initiated by a disagreement over whether to turn the child over in compliance with the order of this court. The paternal grandfather, according to the father, was violently opposed to the return of the child. The father admits that he absconded with the minor child in deliberate violation of the order of this court but denies that he knew of an order from a Court in South [sic] Carolina for the return of the minor child to the Petitioners. The paternal grandmother in her testimony admits that she was aware of the order of return entered by the South [sic] Carolina Court and that the father knew of the South [sic] Carolina Court order. The South [sic] Carolina attorney representing the father was present when the South [sic] Carolina order was entered. The court specifically finds the testimony of the father not credible on the issue of whether he knew about the South [sic] Carolina Court order ordering the return of the minor child to the Petitioners.

3. The Court finds that the Petitioners are of good character and have cared for the minor child in an exemplary way for most of the child's life.

4. The Petitioners provide an excellent nurturing environment for the minor child and the child has bonded to the Petitioners.

5. During the time the Petitioners have had custody of the minor child the Peti-

tioners have provided the entirety of the support for the minor child except for a sum of about $175 to $225 which was sent by the father for child support.

6. The father abdicated the financial support of the minor child to the Petitioners during the time that they have had custody of the minor child.

7. The only employment that the father has had during his adult life is working for the paternal grandfather on what is described as a part-time basis.

8. The paternal grandmother is also employed in the salvage yard business of the paternal grandfather even thought [sic] they have been divorced for many years.

10. The father has had quite a few brushes with the law with several arrests and at least one misdemeanor conviction. The home studies of the parties were admitted into evidence without objection. The father has had an arrest for possession of marijuana since the birth of the child. The father states that he was driving someone else's car, without a driver's license, because the mother of the child would not pick he and the child up. He claims he did not know the marijuana was in the car. Relative to the misdemeanor conviction, the father claims that he pleaded guilty to some sort of misdemeanor possession of stolen property case, even though he was innocent, to obtain a reduction of a felony charge.

11. The father admits to the use of controlled substances prior to the birth of the minor child and denies use thereafter.

12. The paternal grandfather has been twice convicted of felonies and served prison time many years ago.

13. The father has Attention Deficit Disorder with hyperactivity. The paternal grandfather and father both describe him as continually going on to something which appears more challenging.

14. The father dropped out of high school as a freshman and has been working on his GED for some time.

15. The father is unable to provide information about his income.

17. The father currently has a badly fractured leg and has had surgery on the leg and pin surgically implanted in the leg. The father is on crutches and will be unable to care for an active four-year-old without substantial assistance from other persons.

18. The father is presently on Medicaid.

19. The father states that the minor child will be supplied the best possible health insurance if he gets custody but does not say how he will pay for such insurance.

20. The father is completely dominated by the paternal grandfather and is completely dependent on his father, mother and grandmother for maintenance of his living environment and support.

22. The mother is living in Florida with another man by whom she has a baby. As described above the father chose to hide with the minor child rather than return the child to Petitioners pursuant to two court orders.