In the Matter of Erma Z. OLIVA,
Incapacitated/Disabled,
Appellant,

v.

John G. OLIVA, Jr., Appellant;

R.W. Shackelford, Respondent;

and

Martha Pollard, Limited Guardian
and Conservator for Erma Z.
Oliva, Respondent.

Nos. WD 62366, WD 62415.

Missouri Court of Appeals,
Western District.

Aug. 26, 2003.

James A. Rust, Lexington, for Appellant, Erma Z. Oliva.

Weldon W. Perry, Jr., Lexington, for Appellant, John G. Oliva.

John C. Giorza, Lexington, for Respondent, Martha Pollard.

Randall W. Shackelford, Lexington, respondent pro se.

Before PAUL M. SPINDEN, P.J., THOMAS H. NEWTON and RONALD R. HOLLIGER, JJ.

THOMAS H. NEWTON, Judge.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On March 24, 2000, Ms. Erma Oliva filed a Nomination of Guardian and Conservator in Lafayette County Circuit Court, which designated her son, John G. Oliva, Jr., to serve both as her guardian and conservator "in the event [she was] found to be incapacitated or partially incapacitated." On June 22, 2000, the trial court issued an order declaring Ms. Oliva as being partially incapacitated and partially disabled.[1] The trial court also appointed John G. Oliva, Jr. (Mr. Oliva) as a "limited guardian" of Ms. Oliva, and Simone Burns (Ms. Oliva's daughter) as a "limited conservator of the estate."

On September 12, 2000, the trial court removed Ms. Burns as limited conservator and appointed Mr. Oliva as limited conservator. On December 31, 2000, the trial court issued an Order to show cause why his limited conservatorship should not be revoked for failing to file the annual settlement in proper form, for selling Ms. Oliva's real property without court approval, and for giving money to Ms. Oliva. After a hearing, however, the trial court found that Mr. Oliva had acted in Ms. Oliva's best interests.

On June 5, 2002, the trial court received a letter from Ms. Burns requesting that the trial court assist Ms. Oliva's children to obtain easy access to Mr. Oliva's records showing how Ms. Oliva's assets were being managed for her care and comfort. The trial court then asked Gloria Peters, a social worker with the Missouri Department of Health and Senior Services, to assess Ms. Oliva's situation.

On July 12, 2002, the trial court found that, based on "correspondence received from Missouri Department of Health and Senior Services ... John G. Oliva, Jr., is not effectively performing his duties ... and the welfare of Erma Oliva requires immediate action." The trial court then appointed Randall W. Shackelford to serve a guardian ad litem for Ms. Oliva and "suspended" Mr. Oliva as limited guardian. Mr. Shackelford was instructed to submit a report to the trial court as to whether Mr. Oliva should be permanently removed as Ms. Oliva's limited guardian.

On August 21, 2002, the trial court held a hearing on the matter of the least restrictive environment for Ms. Oliva. Ms. Peters stated that on various visits to Ms. Oliva's home during the summer, the house was messy and the air conditioning was not on but of most concern was that Ms. Oliva had been observed on numerous

---

**1.** The June 22, 2000 order did not specifically identify Ms. Oliva's disability, but Alzheimer's was mentioned throughout the record.

occasions by neighbors and police wandering around in the street.

In his written assessment sent to the trial court, Dr. Haleem, Ms. Oliva's physician since May 2000, stated that while "3 of the daughters ask that Ms. Oliva be placed in a nursing home," twenty-four-hour supervision would be adequate unless further episodes of "wandering" occurred. The daughters referenced in Dr. Haleem's report later denied that they had asked Dr. Haleem to place Ms. Oliva in a nursing home.

The trial court found that, because of Ms. Oliva's continuing wandering in the streets, there was a substantial risk of serious physical harm to Ms. Oliva due to her medical condition and found that the least restrictive environment would be for Ms. Oliva to remain in her home but with day care provided at Bristol Manor. Additionally, the trial court instructed Mr. Oliva to install both a chain link fence and a back door alarm at the Oliva home. Ms. Michele Borgman (Ms. Oliva's daughter), Mr. Denis Oliva (Ms. Oliva's son), and Ms. Shirley Danner (owner of Bristol Manor) all agreed that day care at Bristol Manor had reduced Ms. Oliva's confusion and that she had adjusted well to Bristol Manor.

On the evening of November 1, 2002, Ms. Oliva left her home through an open window. Mr. Shackelford saw Ms. Oliva driving an automobile, contacted Mr. Oliva, and they placed Ms. Oliva in a nursing home temporarily. After some problems with her behavior at the nursing home, Ms. Oliva was transferred to the Research Psychiatric Unit for evaluation. The evaluation found that she was agitated, out-of-control, destructive, hostile, confabulating, and delusional and was given a "guarded diagnosis related to her dementia." Dr. John Pro at Research found that Ms. Oliva needed twenty-four-hour supervision but that moving her to a nursing home was not yet indicated as long as she was doing well at home. Mr. Oliva then made arrangements to care for Ms. Oliva at his home in Kansas City.

On December 6, 2002, Mr. Shackelford filed a Motion to Review Previous Limited Guardian and Limited Conservator appointment and also filed a Motion to Determine the Least Restrictive Environment. Mr. Shackelford cited "great dissension in the family" adding that Missouri law precludes appointment of a family member to these responsibilities when there is dissension and disharmony over the care and treatment of a disabled person.

A hearing was held on the matter on December 20, 2002, where the trial court considered several matters including: Ms. Oliva's other physician, Dr. John Pro's, written opinion; the evaluation from Research Psychiatric Center; Mr. Oliva's plan to provide Ms. Oliva's care; a letter from the Alzheimer's Association; a letter from Ms. Borgman; and testimony from Mr. Shackelford, Denis Oliva, Ms. Burns, Mr. Oliva, Ms. Oliva herself, and Ms. Peters.

The Alzheimer's Association letter stated that with proper set up, supervision, and knowledge, a person with Alzheimer's could live at home indefinitely. Ms. Borgman stated that she would not oppose the twenty-four-hour care arrangement for Ms. Oliva as long as such care was subject to outside supervision. Denis Oliva testified that he had doubts about how long Mr. Oliva's twenty-four-hour care arrangement could last but also stated that he didn't want Ms. Oliva placed in a nursing home. Ms. Burns testified to her concerns about Mr. Oliva's ability to provide Ms. Oliva's care, but Ms. Burns stated that she recognized that Ms. Oliva needed twenty-four-hour supervision.

Mr. Oliva testified that he was currently working two twelve-hour shifts a week (two days a week) at Truman Medical Center East, and he would provide the twenty-four-hour care for his mother five (5) days of the week. Also, he would make arrangements for other people to stay with Ms. Oliva on his workdays. He had previous experience as a nursing home administrator and had also managed four Alzheimer's units.

Ms. Peters testified that the Department of Health and Senior Services could not provide supervision for Ms. Oliva because she was Medicaid-ineligible but that the Department might be able to provide such services if the trial court ordered it to do so.

At the end of this evidence, the trial court revoked Mr. Oliva's limited guardianship and conservatorship. The trial court cited "family discord" and expressed its hope that by appointing a Public Administrator, some disharmony could be eliminated. As the reason for this finding, the trial court cited Mr. Oliva's failure to act when the trial court suspended his authority in July 2002.

The judge issued a written order:

—That due to the extreme family discord and the failure of John G. Oliva, Jr. to properly supervise Ms. Oliva which occasioned his suspension, John G. Oliva, Jr. should be removed as Limited Guardian and Limited Conservator.

—That due to the extreme family discord no family member should serve as fiduciary for Ms. Oliva and that the Public Administrator is fit and proper to act as Limited Guardian and Limited Conservator.

—That Ms. Erma Z. Oliva requires 24 hour supervision 7 days a week and accordingly the least restrictive environment consistent with her needs and safety is the Apple Ridge Care Center at Waverly, Missouri, and

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the Limited Letters of Guardianship and Limited Conservatorship of John G. Oliva, Jr. are hereby revoked . . .

IT IS FURTHER ORDERED that Martha A. Pollard, Public Administrator of Lafayette County is hereby appointed as substitute Limited Guardian and Limited Conservator for Ms. Erma Z. Oliva under all powers and limitations contained in the original Letters of Limited Guardianship and Limited Conservatorship issued hereunder to John G. Oliva, Jr., and

IT IS FURTHER ORDERED that the least restrictive environment and authorized placement for Ms. Erma Z. Oliva is the Apple Ridge Care Center, Waverly, Missouri.

IT IS FURTHER ORDERED that Mr. R.W. Shackelford, Court appointed Guardian Ad Litem, be and hereby is discharged from the appointment with the issuance of Letters of Limited Guardianship and Limited Conservatorship to Martha A. Pollard, Lafayette County Public Administrator.

This is the judgment order appealed from today.

Ms. Oliva brings two points on appeal. In Point I, Ms. Oliva asserts that the trial court erred in removing Mr. Oliva as the limited guardian and conservator "in that [John Oliva] has been specifically nominated by the protectee which had been adopted by the [trial] court in its previous judgment of partial incapacity and there was no substantial evidence that he had failed to perform his duties to require that he be removed as provided for in [§ ]

475.082(5).[2]" In Point II, it is further argued that the trial court erred in removing Ms. Oliva from her son's home and placing her in a nursing home "because for her a nursing home was not the least restrictive environment, in that she was only partially incapacitated and partially disabled and members of her family were capable and willing to provide for her extended care."

## II. STANDARD OF REVIEW

As just mentioned, Ms. Oliva asserts in Point I that the trial court erred in removing John Oliva as the limited guardian and conservator. In *Keyser v. Keyser*, 81 S.W.3d 164, 168 (Mo.App. W.D.2002), this Court stated that the applicable standard of review in this case is as follows:

> Review of a probate court's rulings in a proceeding to appoint a guardian or conservator is governed by *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). *In re Turnbough*, 34 S.W.3d 225, 226 (Mo.App.2000). Under this standard, we are to affirm the judgment of the probate court unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law.

## III. LEGAL ANALYSIS

Applying this standard to our case, we must turn to the statutory provision which vests authority in the trial court to modify the guardian and/or conservator. Section 475.082.5 states as follows in pertinent part:

> If it appears to the court as part of its review or at any time upon motion of any interested person, including the ward or protectee or some person on his behalf, that the guardian or conservator is not discharging his responsibilities

and duties as required by this chapter or has not acted in the best interests of his ward or protectee, the court may order that a hearing be held and direct that the guardian or conservator appear before the court.... At the conclusion of the hearing, *if the court finds that the guardian or conservator is not discharging his duties and responsibilities as required by this code, or is not acting in the best interests of the ward or protectee, the court shall enter such orders as it deems appropriate under the circumstances.* Such orders may include the removal of the guardian or conservator and the appointment of a successor guardian or conservator or termination of the guardianship or conservatorship on finding that the ward has recovered his capacity or the protectee is no longer disabled. The court in framing its orders and findings shall give due consideration to the exercise by the guardian or conservator of any discretion vested in him by law. (emphasis added).

In the trial court's written judgment that we review today, the trial court mentioned "extreme family discord" as grounds for its decision. It cannot be questioned that the record supports the conclusion that such family discord exists, but the question for review is whether this record supports a finding by the Court "that the guardian or conservator is not discharging his duties and responsibilities as required by this code, or is not acting in the best interests of the ward of protectee." § 475.082.5. The aforementioned language is significant because it is under only those circumstances that the trial court is given the authority to take the actions that this trial court did. Furthermore, in appointing a limited guardian or limited conservator, the trial court must follow the statutory requirements of sec-

**2.** All statutory references are to RSMo 2000 unless otherwise indicated.

tion 475.050, which dictate an ordered preference of appointment. Section 475.050 states in pertinent part:

1. Before appointing any other eligible person as guardian of an incapacitated person, or conservator of a disabled person, the court shall consider the suitability of appointing any of the following persons who appear to be willing to serve:

(1) If the incapacitated or disabled person is, at the time of the hearing, able to make and communicate a reasonable choice, any eligible person nominated by the person;

* * *

(3) The spouse, parents, adult children, adult brothers and sisters and other close adult relatives of the incapacitated or disabled person;

* * *

2. *Except for good cause shown*, the court shall make its appointment *in accordance with the incapacitated or disabled person's most recent valid nomination of an eligible person* qualified to serve as guardian of the person or conservator of the estate. (emphasis added).

■ Good cause to appoint a guardian or conservator contrary to a ward's nomination can be found in situations where a financial conflict of interest might exist, *In re Waldron,* 910 S.W.2d 837, 841 (Mo.App. E.D.1995), or where there is substantial dissension and disharmony in the ward's family, *In re Estate of Romberg,* 942 S.W.2d 417, 420 (Mo.App. E.D.1997); *In re Estate of Pittman,* 16 S.W.3d 639, 643 (Mo.App. W.D.2000). In other words, the trial court has discretion to appoint someone other than the ward's nominee or alternatively, a close family member, but only as a last resort and only when there is substantial evidence to show "good cause" for doing so.

■ After reviewing the record before the trial court, we conclude that the trial court's decision to revoke Mr. Oliva's limited guardianship and limited conservatorship and appoint a Public Administrator in direct contravention of the statutory requirement of appointing either a ward's nominee or a family member based on its finding of family dissension, was not supported by substantial evidence that Mr. Oliva had failed to discharge his appointed duties and constituted an abuse of discretion by the trial court. We base this conclusion on several grounds.

Initially, we look to Mr. Oliva's actions and conduct regarding Ms. Oliva in order to determine whether "the guardian or conservator is not discharging his duties and responsibilities as required by this code, or is not acting in the best interests of the ward or protectee." § 475.082.5. In reviewing the facts set out above, it is clear that many minor incidents occurred in the months leading up to the hearing in December 2002. Most of these incidents involved Ms. Oliva wandering unattended. All of the parties agreed that, as of December 2002, Ms. Oliva was in need of twenty-four-hour supervision. Mr. Oliva rearranged his entire work schedule to accommodate this newly recognized need for Ms. Oliva's care. The incident in November 2002, which was arguably the most severe incident, occurred while Mr. Shackelford was Ms. Oliva's guardian ad litem.

While we agree that some incidents that occurred could give rise to concern on the part of the trial court, this Court finds that here, particularly since Ms. Oliva is only partially incapacitated, the trial court did not afford Ms. Oliva's nomination and the statutory preference for a family member adequate consideration and weight in rendering its decision. Also, while there is evidence of some family dissension and disharmony, the dissension is not substan-

tial and, therefore, good cause did not exist for the trial court to ignore the statutory dictates of section 475.050. Most of the evidence in support of the trial court's finding of dissension consisted of letters from various family members. It is certainly true that over the duration of Mr. Oliva's appointment, certain family members had ex parte complaints about Mr. Oliva's performance of his guardianship and conservatorship duties. In response to innuendoes that Ms. Burns had "serious concerns" about Ms. Oliva's care and asking for "access to Ms. Oliva's records" to see how Mr. Oliva was "managing her assets," which Ms. Burns sent to the trial court in a letter, the trial court investigated Ms. Oliva's living conditions and found that, although some additional measures were indicated, as of August 2002, Ms. Oliva was doing well with the Bristol Manor day care arrangement. At that time, the trial court saw no need for twenty-four-hour supervision or nursing home care for Ms. Oliva. This Court finds that the evidence in this case was insufficient to support the conclusion that the trial court reached. Furthermore, the letter from Ms. Burns is not evidence that was properly before the trial court in considering Mr. Oliva's performance of his guardianship and conservatorship duties.

Of particular import is the fact that Ms. Oliva is only partially incapacitated. She is aware of her surroundings, physical limitations, and desires, took an active part in the December hearing, understood questions posed to her, was able to articulate her wishes clearly and was enjoying her current living arrangements with Mr. Oliva. *See In re Walker*, 875 S.W.2d 147, 151 (Mo.App. E.D.1994) (finding that ward was partially, rather than totally, incapacitated was supported by evidence that ward was aware of her surroundings, physical limitations, and desires, was cognizant and took active part in proceedings, understood questions posed to her, was able to articulate her wishes clearly, and was enjoying her current living arrangements, notwithstanding evidence that she was unable to remember dates, names and prices). "In establishing a limited guardianship, the court shall impose only such legal disabilities and restraints on personal liberty as are necessary to promote and protect the well-being of the individual." § 475.080.1. In essence, this means that since Ms. Oliva is partially incapacitated, she is presumed competent. *In re Nelson*, 891 S.W.2d 181, 187 (Mo.App. W.D.1995). Ms. Oliva's nomination of Mr. Oliva should have been afforded greater consideration by the trial court.

 Early in his conservatorship, Mr. Oliva's management of Ms. Oliva's financial affairs was also of concern to the trial court. In December 2001, because Mr. Oliva had failed to file the annual settlement for the estate as required by statute, the trial court issued an Order to Show Cause why his Limited Conservatorship should not be revoked. A guardian's failure to submit annual status reports to the circuit court can contribute to the circuit court's finding that the guardian is neglecting his statutory responsibilities and duties. *Pittman*, 16 S.W.3d at 643. But ultimately, the trial court found that Mr. Oliva had acted in Ms. Oliva's best interests and Mr. Oliva's limited conservatorship appointment was allowed to stand. There was no further evidence that Mr. Oliva had in any way neglected his conservatorship duties and revoking his limited conservatorship was not supported by substantial evidence in this case.

There is family dissension in this case but it is not substantial. The family dissension is manifested through letters and phone calls to the trial court concerning different points of view rather than con-

sisting of any evidence that Mr. Oliva was not performing his duties. Furthermore, although the family members had varying opinions about the best arrangement for Ms. Oliva, the family members were united in their opinion that Ms. Oliva would be very unhappy in a nursing home.

Importantly, Mr. Oliva had been suspended as Ms. Oliva's limited guardian and conservator when the wandering incident occurred in November 2002. Mr. Shackelford, as guardian ad litem, had letters of guardianship which charged him with the "care and custody" of Ms. Oliva in addition to the duties which had formerly been charged to Mr. Oliva. Despite the revocation of his guardianship in July 2002, Mr. Oliva nevertheless assumed those responsibilities when the wandering incident occurred in November 2002. Mr. Oliva immediately began making the necessary arrangements for a change in his work schedule and to provide twenty-four-hour supervision for Ms. Oliva when he could not be at home with her.

Point I is granted and the judgment of the trial court is reversed and remanded for proceedings consistent with this opinion. Mr. Oliva's letters of limited guardianship and limited conservatorship should be reinstated immediately.

■ In Point II, Ms. Oliva argues that the trial court erred in removing her from her son's home and placing her in group living "because for her a nursing home was not the least restrictive environment." We agree. The statutory provision which vests authority in the trial court to determine the least restrictive environment for an incapacitated or partially incapacitated person is section 475.075.10 which states in pertinent part:

If the court finds the respondent to be in some degree incapacitated or disabled, or both, the court, in determining the degree of supervision necessary, shall apply the least restrictive environment principle as defined in this chapter and shall not restrict his personal liberty or his freedom to manage his financial resources to any greater extent than is necessary to protect his person and his financial resources. The court shall consider whether or not the respondent may be fully protected by the rendition of temporary protective services provided by a private or public agency or agencies; or by the appointment of a guardian or conservator ad litem; or by the appointment of a limited guardian or conservator; or, *as a last resort, by the appointment of a guardian or conservator.* (emphasis added).

The definition of least restrictive environment referenced in the statute above requires that "there shall be imposed on the personal liberty of the ward only such restraint as is necessary to *prevent him from injuring himself and others* and to provide him with such care, habilitation and treatment as are appropriate for him considering his physical and mental condition and financial means[.]" § 475.010(10) (emphasis added). Here, there is no evidence that Ms. Oliva had been injured during Mr. Oliva's guardianship and conservatorship nor any evidence that Ms. Oliva was injured or in danger of injury while Mr. Oliva was providing her twenty-four-hour care before the hearing in December 2002.

This Court has found that in making a determination of the least restrictive environment, the trial court should "defer in close cases to the dignity and personhood of the ... incapacitated or disabled person rather than to take a strict paternalistic approach of utmost security." *Nelson,* 891 S.W.2d at 187.

Ms. Oliva is only "partially incapacitated" and, therefore, "presumed to be com-

petent," § 475.078.3. All parties here agree that Ms. Oliva must have twenty-four-hour-a-day supervision. There is no dispute on this particular issue: both doctors, all the siblings, and the guardian ad litem are in agreement on this point. The only question that remains, then, is whether a less restrictive environment than a nursing home can be found that will provide the twenty-four-hour supervision that Ms. Oliva now requires. We believe a less restrictive environment can be found since it already exists in Mr. Oliva's care.

Dr. Pro examined Ms. Oliva in November 2002 and found that Ms. Oliva needed to stay at home near her husband, that she needed twenty-four-hour attendance, and that it would be better for Ms. Oliva to remain at home rather than being placed in a nursing home. Mr. Oliva has made all of the necessary arrangements to enable him to care for Ms. Oliva in his home on a twenty-four-hour basis. Mr. Oliva is a Registered Nurse and has had extensive experience with Alzheimer's patients. Instead of the least restrictive environment, the trial court chose the most restrictive environment. The weight of the evidence, indeed all of the evidence, was that Ms. Oliva was doing very well under Mr. Oliva's twenty-four-hour care at the time of the hearing in December 2002. All of the family members agreed that Mr. Oliva's twenty-four-hour care of Ms. Oliva had gone well as of the date of the hearing. The trial court's own investigation revealed that as of August 2002, Ms. Oliva required day care at Bristol Manor and specifically found that was the least restrictive environment for her. The November 2002 incident may have led the trial court to conclude that more supervision was needed; but, instead of progressing to a 24–hour supervision arrangement, the trial court opted for the most restrictive solution. We believe that there is a progression of solutions available when increasing restraint may be required on someone's liberty. The nursing home arrangement would be the final step in such a progression rather than an interim step. The interim step is what is called for in Ms. Oliva's situation, not the final most restrictive solution.

Point II is granted and the trial court judgment is reversed and remanded for proceedings consistent with this opinion. If Mr. Oliva still has the necessary arrangements in place to care for Ms. Oliva on a twenty-four-hour basis, then Ms. Oliva should be removed from the nursing home immediately and placed under Mr. Oliva's twenty-four-hour care and supervision.

Pursuant to section 475.082.1, the trial court is required to assess the status of a protectee or ward on an annual basis. It is our view that the trial court may in its discretion decide to monitor the care of Ms. Oliva on a quarterly or bi-annual basis.

Perhaps this opinion will allow the family to re-unite in the interest of meeting Ms. Oliva's needs and welfare and will allow for communication to occur within the family. This Court sincerely hopes that this family can take this opportunity to make a fresh start with a reinvigorated focus on Ms. Oliva's health and welfare rather than on the relatively small differences seemingly dividing them.

PAUL M. SPINDEN, P.J., and RONALD R. HOLLIGER, J., concur.