In the ESTATE OF Alex GUEVARA and Kyndria Guevara, minors.

No. 26797.

Missouri Court of Appeals, Southern District, Division One.

Feb. 15, 2006.

Motion for Rehearing and Transfer Denied Feb. 24, 2006.

---

James R. Sharp, Springfield, for appellant.

Linda K. Thomas, Springfield, for respondents Claude & Carolyn North.

Deanna K. Scott, Springfield, for respondent Deloris Guevara (no brief filed).

NANCY STEFFEN RAHMEYER, Presiding Judge.

James Bennett and Loralee Bennett ("the Bennetts") appeal a judgment of the Probate Division of the Circuit Court of Greene County, Missouri, entered December 27, 2004. The judgment orders the removal of the Bennetts as guardians of minors, Kyndria Guevara ("Kyndria"), born May 30, 1993, and Alex Guevara ("Alex"), born May 29, 1994. Kyndria and Alex are the biological children of Deloris and Juan Guevara.[1]

The petition to remove the Bennetts as guardians of Kyndria and Alex was filed by Claude and Carolyn North[2] ("the

---

**1.** The whereabouts of Juan Guevara are unknown.

**2.** Carolyn North is also the guardian of Deloris Guevara ("Mother"), the biological mother of Alex and Kyndria, who suffers from schizophrenia. Carolyn North signed the petition

Norths"), the former guardians of the children. The petition alleged the following: (1) the Bennetts had failed to act in the best interests of Kyndria and Alex by limiting and/or denying contact between the children and their biological family; (2) the Bennetts were not suitable to exercise the trust reposed in them due to their actions to deny the children contact with their biological family; (3) before being appointed as guardians, the Bennetts assured Mother that she would have contact with the children and enjoy free interaction with the children; (4) immediately upon being appointed successor co-guardians, the Bennetts began to decrease the frequency and duration of contact between the children and their biological family; (5) the Bennetts were now trying to adopt Kyndria and Alex and permanently sever any relationship between the children and their biological family; (6) James Bennett stated that there will be a long court battle regarding the adoption of the children thereby intimidating the natural mother and former co-guardians; and (7) Mother was not told prior to the appointment of the Bennetts as guardians that Loralee Bennett traveled extensively as part of her job and that the children would be cared for primarily by James Bennett. The Norths also requested that upon removal of the Bennetts as co-guardians that the Norths be reappointed as successor co-guardians. Hearings were held December 15 and 16, 2004. The trial court removed the Bennetts as co-guardians and re-appointed the Norths as co-guardians.

A review of the record shows that Mother had lived in the Kansas City, Missouri, area for most of her life until July 2002, when she and her children moved to Springfield. Mother and the children lived with the Norths until Mother began living in a facility in Nixa, at which point the children continued living with the Norths. On September 24, 2002, the Norths were appointed by the court to serve as co-guardians for Alex and Kyndria. In the care of the Norths, Kyndria and Alex did well in school, participated in activities, had friends, and attended church. The children remained close to their mother and while Mother was in the Nixa facility she visited with her children about every ten days. Claude North had a heart attack in August 2003, and the contact between Mother and her children decreased.

Carolyn North decided to place Mother in a facility in Raytown, a suburb of Kansas City, due to the stress of her husband's heart attack and the fact that few of Mother's family members visited her in Nixa. Mother moved to the Edgewood facility in Raytown in March of 2004; her immediate family lived in that area. Carolyn North did not consider any of the children's relatives to be suitable guardians of the children; therefore, she commenced a search for someone in the Kansas City area to care for Kyndria and Alex in order for the children to be able to visit with their mother more frequently. She contacted Gary Anderson, an elder at the Church of Christ, and asked him if he believed there was a family in his church willing to be guardians of the children.[3] The elders selected the Bennetts. The Bennetts, with the consent of the Norths, replaced the Norths as co-guardians, and Kyndria and Alex went to live with the Bennetts on May 20, 2004.

twice, the second time as the guardian of Mother.

**3.** Carolyn North had confidence in Gary Anderson because Mother had attended the Church of Christ for a considerable time growing up and Carolyn's father had been an elder with the church.

Mother and the Norths began having trouble contacting the children almost immediately after the children went to live with the Bennetts because the Bennetts were intentionally discouraging contact and visitation. James Bennett admitted that little more than a week after the children arrived in their home, he and his wife contacted an adoption attorney. The adoption attorney advised the Bennetts to accommodate visitation between Mother and her children when initiated by Mother, but not to encourage visitation themselves. The attorney told the Bennetts that in order to adopt Kyndria and Alex, the children could not have contact with Mother for a period of six months. The Bennetts only allowed one of the children to speak with Mother when she called. Mother was not invited to attend a birthday party held by the Bennetts, but other members of Mother's family living in the area were invited. The children saw Mother only two times between June, July, and August, even though Mother lived near the Bennetts.

The Norths became seriously concerned in June 2004, that the Bennetts were not appropriate guardians as they learned more about their intentions. The Norths learned that on June 1, the Bennetts arranged a meeting with Mother and told her that they wanted to adopt Kyndria and Alex. James Bennett also told Carolyn North in early June that he and his wife had chosen new names for the children and planned on obtaining new birth certificates, so no evidence of Mother or the children's father would exist. Carolyn North responded that she did not want them to adopt Kyndria and Alex. She called Gary Anderson to tell him that they

were definitely not interested in having the Bennetts adopt the children. The Norths realized in early August that Mother had only had two opportunities to see the children since they began living with the Bennetts, once on June 1, 2004, and then at church on July 18, 2004; they sent a letter to the court and a subsequent petition asking for the removal of the Bennetts.[4] The court appointed a guardian ad litem ("GAL") for the children.

The GAL testified that she believed it would be best for the children if the Bennetts were removed as guardians. She was concerned with the fact that the Bennetts accepted a role as guardians, but from the beginning their intention was to adopt the children. The GAL noticed that the children's records indicated that they had dental problems, previous medical problems, previous counseling, previous allegations of sexual abuse, previous allegations of physical abuse and neglect, and when she first spoke with the Bennetts she was "very, very surprised" that the Bennetts had made no effort to have the children seen by a doctor, dentist, psychologist or counselor. Instead, the Bennetts had taken the kids on very expensive vacations in the summer, which made the GAL question the motives of the Bennetts. The GAL was also concerned about the children's transition and believed that the children needed some support from the Norths in order to make a successful transition, but this was not possible. The Bennetts were very candid and explained to her that they were not willing to make arrangements with the Norths or Mother unless they initiated it, or, as James Bennett stated, if they "[s]how[ed] up at our doorstep." James Bennett further testi-

4. Mother moved back to Springfield in late September 2004, because she saw very little of her immediate family while living in the Edgewood facility in Raytown and she want-
ed to be closer to the Norths. Mother began living at Victory House, a facility that would help her transition to independent living.

fied that it was in the best interest of the children to adopt them even though adoption was not an option at the time of the hearing and he was not receptive to co-guardianship with the Norths or anyone else.

The GAL made it clear that Kyndria and Alex were much more reserved with the Bennetts. She noticed Kyndria and Alex were scared to visit the Norths because they feared how the Bennetts would react to their opportunity to visit with the Norths. She also claimed that when asked why they liked living with the Bennetts, Kyndria and Alex responded about the "things" they liked but they did not talk about the people or the relationships. In contrast, the children stated they liked living with the Norths because they sincerely enjoyed the Norths, "[t]hey like playing the instruments. They like cooking. They baked pies and make cookies with Carolyn. They went places with Carolyn."

As to the relationship between Mother and the children, Kyndria and Alex related to the GAL that they enjoyed their mother's "hugs and kisses." As a result of all of the evidence, the GAL believed that Kyndria and Alex love Mother and it was very important for them to maintain their relationship with her; she was concerned that the Bennetts would not foster the relationship between the children and Mother. The GAL believed the most important thing for Kyndria and Alex was to concentrate on school, concentrate on making a good adjustment to whatever living situation they were in, and maintain a healthy relationship with Mother.

The GAL concluded:

I think it's important that whoever the children are placed with have the approval and support of the mother so that when discipline problems come up or the happy occasions—weddings, babies, high school graduations, band concerts, Christmas plays—that there can be some unity between the mother and the—the family and the—the—that they're placed with and the children.

I just—I don't think they're going to have that if they stay with the Bennetts and I'm concerned about that. I've seen these children with the Bennetts, I've seen these children with the Norths and I've seen these children with their mother. And they are far more comfortable, far more relaxed and far more uninhibited when they're with the Norths and with their mother.

The trial court found that when the Bennetts became co-guardians for Kyndria and Alex problems began almost immediately, that the Bennetts were making no effort to establish contact between the children and Mother. Although the Bennetts testified that the Norths had encouraged them to adopt the children, the Norths disputed this claim. Evidence showed that the Bennetts met with an adoption attorney as early as late May and were advised to accommodate, but not encourage, visitation with Mother. The trial court stated that regardless of what the Norths had told the Bennetts concerning the adoption, by June 2004, the Norths were very much opposed to the idea of the Bennetts adopting the children.

The trial court found that continued contact between Mother and the children was of the "utmost importance," and the Bennetts had made visitation with Mother difficult. As a result, the trial court found the Bennetts were unsuitable guardians, in part because the Bennetts were still clearly interested in adopting the children even though adoption would not have been in the best interest of the children. According to the trial court, Kyndria and Alex have a family and they should be returned to it, "[i]t may not be a picture perfect

family but they are willing to raise these children and the court will appoint them as successor guardians."

■ The Bennetts bring one point on appeal, claiming substantial evidence does not support the judgment and it is a misapplication of the law to remove the guardians because no evidence existed to show that the Bennetts "failed to perform their duties as guardians, mismanaged the children's estate, acted to endanger the children, or committed any other act" necessary for the removal of the guardians as set forth in sections 475.110 and 473.140.[5] The Bennetts contend that any actions denying contact between the children and their mother is not a reason for their removal as guardians. They argue the only provision for removal of a guardian is provided by section 473.140, which provides for the removal of a guardian if he:

> becomes mentally incapacitated or is convicted of a felony or other infamous crime, or becomes an habitual drunkard, or in any manner incapable or unsuitable to execute the trust reposed in him, or fails to discharge his official duties, or wastes or mismanages the estate, or acts so as to endanger any corepresentative, or fails to answer any citation and attachment to make settlement. . . .

The Bennetts contend that their actions do not fall within any of those specific provisions and that the facts of this case are similar to *Oliva v. Oliva*, 113 S.W.3d 269 (Mo.App. W.D.2003), where the Western District of this Court reversed the removal of a ward's guardian based upon grounds that no substantial evidence supported a finding that the guardian had failed to perform his duties. The Bennetts' reliance on *Oliva* is misplaced. Other than the reversal of the removal of a guardian, the facts are completely inappo-site. *Oliva* involved a situation in which the court, at the request of an elderly woman, appointed the woman's son to be her limited guardian and conservator. *Id.* at 270. At issue was whether the court properly ordered that the least restrictive environment for the woman was in a nursing home and whether a public administrator should be appointed as a guardian and conservator because of the "family discord." *Id.* at 272–73. The court found it an abuse of discretion because due consideration was not given for the appointment of a family member or the ward's nominee. *Id.* at 274. Nothing in that decision resembles the issues before this Court; however, it is interesting to note that the appellate decision is based upon section 475.082.5 for the appropriate standard for removal of the guardian or conservator.

Section 475.082.5 provides, in pertinent part:

> If it appears to the court as part of its review or at any time upon motion of any interested person . . . that the guardian or conservator is not discharging his responsibilities and duties as required by this chapter or *has not acted in the best interests of his ward or protectee*, the court may order that a hearing be held and direct that the guardian or conservator appear before the court. . . . At the conclusion of the hearing, if the court finds that the guardian or conservator is not discharging his duties and responsibilities as required by this code, *or is not acting in the best interests of the ward or protectee*, the court shall enter such orders as it deems appropriate under the circumstances. Such orders may include the removal of the guardian or conservator. . . .

(emphasis added).

Although the Bennetts claim the court did not find any statutory ground pursuant

---

5. All references to statutes are to RSMo 2000, unless otherwise specified.

to section 475.110, which incorporates the grounds for removal listed in section 473.140, for the removal of personal representatives, *In re Estate of Pittman*, 16 S.W.3d 639 (Mo.App. W.D.2000), specifically notes that pursuant to section 473.140 any interested person may make a complaint concerning the personal representative for the removal of a personal representative. *Id.* at 641. After determining that the plaintiff in *Pittman* was a proper party to petition the court for the removal of the guardian and conservator, the court noted section 475.082.5 "authorizes the circuit court to act on [the interested person's] petition." *Id.* The court concluded that the ward's best interest is a reason for removal under section 475.082.5 and analyzed the evidence on that basis. *Id.* at 642; *see also In re Estate of Juppier*, 81 S.W.3d 699, 701 n. 4 (Mo.App. E.D.2002) (holding the use of section 475.082.5 is appropriate statutory ground authorizing the removal of a guardian who is not discharging his duties and responsibilities or has not acted in the best interest of the ward).

■ We find *Pittman* to be well reasoned and adopt its reasoning in our decision. Section 475.110 is but one statutory provision for the removal of a guardian or conservator and simply provides that a guardian or conservator may also be removed on the same grounds as is provided for the removal of a personal representative, section 473.140. Section 475.110 is not the exclusive means of the removal of a guardian or conservator as section 475.082, which calls for the review of the status of persons under guardianship or conservatorship, provides that the court must ascertain whether the guardian or conservator is discharging his responsibilities and duties in accordance with this chapter. Section 475.082.5 specifically states that the court may enter an order that it deems appropriate, including the removal or termination of the guardian or conservator, when it finds the guardian or conservator is not discharging his duties and responsibilities as required by this code or is not acting in the best interests of the ward or protectee.

An interpretation of section 475.082.5 to allow the modification of a guardianship on the basis that the guardian is not acting in the best interest of the ward conforms to other sections of the probate code. For instance, section 475.110 provides that a minor ward, who has attained the age of fourteen years, may petition to have his guardian removed if it is for the best interest of the ward. Section 475.083 was amended in 2001 to include a provision allowing for the termination of a guardianship or conservatorship if the court finds that a parent is fit, suitable and able to assume the duties of guardianship and it is in the best interest of the minor that the guardianship be terminated. Under that provision, the court does not have to find an additional statutory ground of a failure on the part of the guardian.

■ Although we find no merit to the Bennetts' claim that the judgment is not supported by substantial evidence and a misapplication of sections 475.110 and 473.140, because this involves the custody of children we have reviewed the record in its entirety and find that substantial evidence supports the determination that the guardianship of the Bennetts should be terminated. From the outset, we note that this was a private guardianship, brought by Mother's own guardian, with the purpose of finding someone who resided closer to Mother to care for the children so that visitation with Mother could be facilitated. We give due regard to the trial court's opportunity to judge the credibility of the witnesses. *In re Moreau*, 18 S.W.3d 447, 449 (Mo.App. S.D.2000). The

children were raised by Mother until they were eight and nine years old and, as the court found, "to cut off contact would be extremely harmful." Additionally, while the Norths had the children, visitation between Mother and children took place and the children did well. The Bennetts, who had no relation to the children, made a concerted effort to hinder the relationship between the children and Mother, despite the fact that the children love their mother and want to spend time with her. The Bennetts are still interested in adopting these two children even though "it appears clear that an adoption is not in their best interest." We find substantial evidence supports the determination that it is in the best interest of the children to remove the Bennetts as co-guardians and find no trial court error.

The judgment is affirmed.

PARISH, J., McGHEE, Senior Judge, concur.