**ESTATE OF L.G.T., A Minor,**

**A.D., Respondent–Appellant,**

v.

**N.R., Petitioner–Respondent.**

**No. SD 32692.**

Missouri Court of Appeals,
Southern District,
Division Two.

May 5, 2014.

Motion for Rehearing and/or Transfer
to Supreme Court Denied May
28, 2014.

Application for Transfer Denied
Aug. 19, 2014.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Thad M. Brady, Jackson, MO, Attorney for Appellant.

Mark L. Richardson, Poplar Bluff, MO, Attorney for Respondent.

DON E. BURRELL, J.

This is an appeal of a probate judgment granting letters of guardianship and conservatorship ("guardianship"[1]) to N.R. ("Grandmother"), the paternal grandmother of the minor child at issue, L.G.T. ("Child"), over the objection of A.D., Child's natural mother ("Mother").

Mother's first point contends the trial court erred as a matter of law "by continuing the August 20, 2012 guardianship hearing and ordering the collection of additional evidence ... in that the trial court acted on its own initiative, and not at the request of any party[.]" Mother asserts "that such action had the effect of removing the burden of proof from [Grandmother] and shifting the burden onto the trial court[.]" Her second point contends:

> The trial court erred by finding [Mother] unfit, because such finding is not supported by the evidence and is against the weight of the evidence, in that the trial court failed to consider credible, uncontradicted evidence, considered inadmissible evidence and evidence that was not relevant to [Mother]'s fitness, and that the evidence and circumstances viewed as a whole demonstrated [that Mother] was fit to be guardian over [Child].

Because Mother's first point was not preserved for appellate review, and her second lacks merit, we affirm the judgment of the trial court.

---

1. Although letters of guardianship and conservatorship were sought and issued, none of the appellant's complaints challenge the trial court's grant of the letters of conservatorship.

### Applicable Principles of Review and Governing Law

■ "The trial court's judgment in guardianship proceedings is to be affirmed unless it is unsupported by substantial evidence, is against the weight of the evidence, or erroneously declares or applies the law." *In re M.B.R,* 404 S.W.3d 389, 392 (Mo.App.S.D.2013). We review questions of law *de novo,* but in reviewing questions of fact, we defer to the factfinder. *White v. Dir. of Revenue,* 321 S.W.3d 298, 308 (Mo. banc 2010). As a result, "[w]e view the evidence and any reasonable inferences therefrom in the light most favorable to the court's decision and disregard all contrary evidence and inferences." *In re C.C.S.,* 393 S.W.3d 105, 108 (Mo.App.W.D.2013).

When evidence is contested by disputing a fact in any manner, this Court defers to the trial court's determination of credibility. *Hinnah v. Dir. of Revenue,* 77 S.W.3d 616, 620 (Mo. banc 2002); Rule 84.13(d)(3).[2] A trial court is free to disbelieve any, all, or none of that evidence. *York* [*v. Dir. of Revenue*], *186 S.W.3d* [*267,*] *272* [*(Mo. banc 2006)*]. *Appellate courts defer to the trial court on factual issues "because. it is in a better position not only to judge the credibility of witnesses and the persons directly, but also their sincerity and character and other trial intangibles which may not be completely revealed by the record."* Essex Contracting, Inc. v. Jefferson Cnty., *277 S.W.3d 647, 652 (Mo. banc 2009) (internal citations omitted). The appellate court's role is not to re-evaluate testimony through its own perspective.* Id. *at 653.* White, 321 S.W.3d at 308–09. "[A] party can contest the evidence in many ways,

such as by putting forth contrary evidence, cross-examining a witness, challenging the credibility of a witness, pointing out inconsistencies in evidence, or arguing the meaning of the evidence." *Pearson v. Koster,* 367 S.W.3d 36, 44 (Mo. banc 2012).

■ "[W]ith respect to evidentiary rulings, the trial court 'enjoys considerable discretion in the admission or exclusion of evidence, and, absent clear abuse of discretion, its action will not be grounds for reversal.'" *Moore v. Ford Motor Co.,* 332 S.W.3d 749, 756 (Mo. banc 2011) (quoting *State v. Mayes,* 63 S.W.3d 615, 629 (Mo. banc 2001)).

Three statutes govern appointing a guardian for a minor child. Section 475.025 RSMo 1994 states that a father and mother are the natural guardians of a minor child. Section 475.030 authorizes the granting of guardianship letters in three instances: (1) when a minor's parents are deceased; (2) "[w]here the parents or the sole surviving parent of a minor are unwilling, unable, or adjudged unfit to assume the duties of guardianship," or (3) where the minor's parents' parental rights have been terminated. Section 475.045 gives the parents first priority in appointment as guardian or conservator of a minor, except as otherwise provided in section 475.030.

Reading these statutes together, "letters of guardianship for a minor should not issue unless there is no parent available, willing or able to fulfill the parental role in caring for a child and providing for that child's needs as natural guardian." *Estate of Casteel v. Guardian ad Litem,* 17 S.W.3d 585, 588 (Mo.App. 2000) (citing *Reece v. Reece,* 890 S.W.2d 706, 710 (Mo.App.1995)).

**2.** Unless otherwise indicated, all rule references are to Missouri Court Rules (2013), and all statutory references are to RSMo 2000.

Moreover, these statutes create a rebuttable presumption that a natural parent is the appropriate custodian for a minor child. *Cotton v. Wise*, 977 S.W.2d 263, 264 (Mo. banc 1998). This presumption may be overcome by evidence that a parent is unwilling, unable, or unfit to take charge of the child. *Id.* *Flynn v. Flynn*, 34 S.W.3d 209, 211 (Mo. App.E.D.2000). "Consequently, if there is sufficient evidence here that [Mother] was unfit, unwilling, or unable to take charge of [Child], then any presumption in favor of [her] is gone and the trial court properly appointed [Grandmother] as guardian." *In re T.A.P.*, 953 S.W.2d 638, 642 (Mo.App. S.D.1997).

### Facts and Procedural Background [3]

#### *The Initial Hearing*

On August 20, 2012, the trial court heard the following evidence in a hearing that addressed both Grandmother's petition for guardianship and Mother's related petition for a child order of protection against Grandmother ("the first hearing").

Child was born in Arizona in 2007. Child's biological father ("Father") died the following year. Mother testified that when Child was born, Child required special care in the hospital to feed her and give her oxygen because she appeared "lifeless." After her release from the hospital, Child was placed in a program Mother referred to as "AZ–EIP[.]" Under this program, "a nurse c[a]me to the house to monitor [Child's] development every six to eight weeks."

Grandmother testified that "ever since [Child] was born [there had] definitely been problems" with her development. Grandmother was concerned about Child's physical condition because "she just was very weak and didn't move like other children[.]" Grandmother spoke to Mother about her concerns, but Mother assured Grandmother that Child would "be fine." [4] Grandmother did not think that Mother had sought treatment or a diagnosis for Child in Arizona, and Grandmother was concerned about what she considered to be Mother's denial of Child's problems.

After Child's father died, Child went to visit Grandmother several times. The parties then decided that Child would visit Grandmother for the summer of 2011 while Mother "relocated to Phoenix" from Kingman, Arizona. Grandmother used this extended visit "as an opportunity to seek some professional help" for Child. Mother agreed to Grandmother taking Child to medical appointments, and she cooperated with "the health care decisions" regarding Child.

Child was scheduled to have a dental appointment in Arizona that summer, but the appointment conflicted with Child being placed in Grandmother's care, so Grandmother took Child to a pediatric dentist, who diagnosed Child with having "eight or nine" cavities. Child also "had broken a tooth in the front[.]" Grandmother had the necessary dental work performed in Missouri, and Grandmother paid for it. Grandmother had previously talked with Mother about the need to brush Child's teeth because Grandmother had taken Child to the dentist on an earlier visit, and Child also had eight or nine different cavities at that time. After Child

---

**3.** Our recitation of the relevant facts is in accordance with the preceding principles.

**4.** At one point in her testimony, Mother said that Child "was in the lower bracket [of development] but to the nurses she was still pass-

ing." At another point she said Child was "only, you know, a few months behind in any of the milestones that she hit, ... she was just a few months delayed behind in rolling and in crawling and in—she was walking."

received the fillings while staying with Grandmother in June 2011, Child thereafter had a "six-month check-up . . . and she had no cavities[.]"

Grandmother also took Child for a physical evaluation, and she followed that with a trip to have Child examined by "a pediatric neurologist in St. Louis." According to Mother, Child's insurance "[t]hrough the state plan" had "lapsed" because Mother was "making too much money[.]" Grandmother offered to fly Mother to Missouri to be present for one of the diagnostic procedures that involved sedation of Child, but Mother declined, saying either that she was busy with work or that her teenage son ("Brother") "was in the middle of another crisis."

Dr. Brandy Dallas testified that she had provided Child with physical therapy twice a week at the Kenny Rogers Children's Center ("KRCC") since July 2011, when Grandmother sought her services. Dr. Dallas made a referral for neurological testing, and it was her understanding "that [the] neurologist gave [Child] the diagnosis of centronuclear myopathy after a series of blood tests and muscle biopsies[.]" Child also received speech therapy twice a week at KRCC, and Child participated in a home program that continued working on the skills addressed at KRCC.

A "Dynamic Realignment Orthosis" ("DRO") "was custom made for [Child,]" and Child wore it every day to help support her muscles and her breathing. The DRO cost "about twelve hundred dollars." Before obtaining the DRO, two other garments were tried, each of which cost "in excess of a thousand dollars[.]" Grandmother paid for all of the garments "out of her pocket[.]" Dr. Dallas said that Child would require a new DRO when she physically outgrew the current one.

Child's therapy program was "[h]ighly specialized[,]" and it was unlike a typical therapy program someone would undergo for something like a broken leg. Dr. Dallas had "definitely" seen progress in Child's treatment to the point that "for the most part [Child] walks with a much more normal gait pattern[,]" and "[s]he has access to [a] range of motion she didn't have before." Dr. Dallas opined that without the treatment regimen, Child "could lose the ability to walk independently. [Child's] respiratory health could decline to the point to where if she got pneumonia it would potentially be something she couldn't recover from." "That is why we emphasize so much the importance of the home programming and the following through with the recommendations." Dr. Dallas opined that

it would be best for [Child] to continue to receive the physical and speech therapy at the intensity and frequency that she's currently receiving it from a group of therapists that are trained in working with children with neuromuscular diseases and have experience in that specialty area, as well as continuing with all of the home programming that has been provided and the extensive medical care that she will need via neurologists, potential respiratory therapists or pulmonologists, as well as the connection with the Muscular Dystrophy Association that can provide her support along the way as well.

Other facilities could provide Child with the kind of care she received at KRCC, but KRCC was the only one that did so "at no charge" if the child did not have adequate insurance coverage. The lack of charge did not apply to "durable medical equipment" that was considered "outside medical[.]"

Mother asked Grandmother to keep Child after the summer of 2011 ended and enroll Child in school in Missouri because Mother had not yet found a house to rent,

and Mother had "broke[n] her foot" while working as an exotic dancer. Another reason Mother gave for leaving Child with Grandmother was that Mother wanted to get things "straightened out" with Brother.

Grandmother was aware that Brother had been removed from Mother's care and that he had problems with "truancy and curfew[.]" Mother said that Brother "first got into trouble when he was eight years old[,]" and he had since incurred "curfew violations[.]"

Mother called Grandmother "at least once a week[,]" but she did not always talk to Child during those calls. Sometimes Mother did not even ask about Child; she called "[j]ust to chat about what was going on with her life and what she was up to." Mother did not visit Child, and she did not send cards to Child on her birthday or provide Child with any gifts or cards at Christmas time. Grandmother purchased an airline ticket for Mother to come to Missouri on July 10, 2012, and Grandmother also purchased tickets for Child to return with Mother to Arizona on July 16, 2012. Grandmother testified that the night before Mother came home, Child indicated to her that Mother's adult brother ("Uncle") had "touched [her] where you're not supposed to be touched[.]" This was troubling to Grandmother because it was her understanding that Uncle would be one of Child's babysitters in Arizona, and Mother told Grandmother that Uncle had come to live with Mother after "her parents had kicked him out[.]"

When Mother came back to Missouri, Grandmother told Mother what Child had said about Uncle. Mother indicated that she did not think that anything had happened. Grandmother told Mother she could not "even think about putting this child on an airplane knowing that she's going to go back and be taken care of by this man." Grandmother filed her petition for guardianship on July 16, 2012. Mother testified that she listened to Grandmother's "allegations" about Uncle, but she did not think that there was any basis for them. Mother still planned on having Uncle help care for Child.

Lindsey Payne, a deputy juvenile officer for Stoddard County, became involved in the case after "[t]he juvenile office had been informed of a child protection order that was placed[.]" The juvenile office "did not take jurisdiction of [Child]" after it determined that Child "was safe with [Grandmother]" and "[G]randmother agreed that she would keep [Child] with her until the guardianship hearing was held."

Mother acknowledged that when Child came to Missouri in June 2011, Mother was "drawing social security on [Child]" in the amount of $906 per month. Mother had received that amount each month since the death of Child's father. Mother admitted that she spent the money and had contributed "none of it" to Child's support while Child was living in Missouri. Mother testified that she was employed "as a loan officer and . . . as an exotic dancer[.]"

After Mother testified, counsel for Grandmother called a rebuttal witness.[5] Before any testimony was presented by this witness, the trial court asked counsel to approach. The proceedings at the bench conference were inaudible and could not be transcribed. The trial court then announced on the record that

> there are just too many unresolved issues that require further evidence the

---

5. The witness was identified as "Mike Davis[.]" After the hearing resumed in February 2013, Michael Davis, a juvenile officer, was called as a witness.

nature of which is making it complicated to obtain simply by virtue of distance between Missouri and Arizona, so [the trial court has] no alternative in this case in [its] opinion except to continue this hearing for further evidence.

No objection was made to this ruling.

The trial court further stated:

Now consistent with the probate (inaudible) the State of Missouri, guardianship law, pursuant to section 475.097,[6] the statute provides that if a natural guardian, in this case [Mother], is not effectively performing his or her duties and the Court further finds that the welfare of the minor, and I'm paraphrasing when I read this, requires immediate action, it may, with or without notice, appoint a guardian or conservator ad litem for the minor, et cetera, et cetera. The appointment of a guardian ad litem by its nature shall be limited in terms to the duration to the proceeding—to the period preceding appearing of the petition for the appointment of guardian or conservator.

Since this hearing is continued I find it altogether appropriate to make a further appointment in this case of a guardian ad litem pursuant to specifically section 475.097. Due to the conflicting interests of the parties involved that appointment is made.

The trial court appointed the Public Administrator, Pam Lape, as guardian ad litem and conservator ad litem under section 475.097, with the original guardian ad litem, Michael Moroni, "continu[ing] to serve as [Child's] lawyer."

The trial court ordered Mr. Moroni to "obtain and review the medical records, the medical diagnosis and prognosis of [Child]" after Ms. Lape secured the records. Mr. Moroni was "further ordered to investigate the allegations of sexual abuse of [Child,]" and "to investigate the appropriateness of [M]other's parenting skills relative to the restrictions being placed on

---

6. Section 475.097 provides:

1. If a natural or appointed guardian or conservator is not effectively performing his duties and the court further finds that the welfare of the minor or incapacitated or disabled person requires immediate action, it may, with or without notice, appoint a guardian or conservator ad litem for the minor or incapacitated or disabled person. An appointment of a guardian or conservator ad litem shall be by its terms limited in duration to the period preceding the hearing on a petition for appointment or removal of a permanent guardian or conservator or for a specified period not to exceed six months. A guardian ad litem of the person is entitled to the care and custody of the ward, a conservator ad litem is entitled to the care and custody of the property of the protectee, and the authority of a permanent guardian or conservator previously appointed by the court is suspended so long as a guardian or conservator ad litem has authority. A guardian or conservator ad litem may be removed at any time. A guardian or conservator ad litem shall make any report the court requires. The expenses and reasonable compensation of a guardian or conservator ad litem may be taxed as costs. In other respects the provisions of this code concerning guardians and conservators apply to guardians and conservators ad litem.

2. In addition to the provisions of the rules of civil procedure relating to parties, if it is suggested in a petition filed by the protectee, creditor or other interested person, including a person interested in expectancy, reversion or otherwise, or if it affirmatively appears to the court that there is a possible conflict of interest between the ward or protectee and his guardian or conservator, the court may appoint a guardian or conservator ad litem to represent the ward or protectee in any proceeding to adjudicate the rights of the parties. The guardian or conservator ad litem shall have only such authority as is provided in the order of appointment and shall serve until discharged by the court.

[Brother] by the State of Arizona." There was no objection to the orders directing Mr. Moroni to investigate the matters specified by the trial court.

The trial court ordered Ms. Lape to "secure the medical records relative to [Child's] care, her diagnosis, her prognosis, and provide copies of those to the attorneys and guardian ad litem." The trial court also ordered Ms. Lape "to investigate and coordinate the payment of th[e] SSI benefit.... being paid to [Child] and [determine] whether or not she, as guardian ad litem, should be in charge of ... securing those payments to the appropriate party, as may be determined under federal law[.]" Ms. Lape was "also ordered to coordinate and evaluate [Mother's] transition plan[,]" and "[M]other's plan for providing care as a single parent to [Child] while [Mother is] working."

Counsel for Mother and Grandmother were ordered to "provide legal trial briefs" on the issue of "when the best interest test of [Child] can come into play in regard to the issue of whether or not [Mother] is unfit." No objection was made to these further rulings. Additionally, the trial court ordered Mother and Grandmother to "each post with the circuit clerk an additional five hundred dollars ... to defray any ongoing expenses or costs that may be incurred by [Mr.] Moroni as guardian ad litem." No objection was made to this order.

At the conclusion of its oral rulings, the trial court directed counsel for Grandmother to "coordinate with [the trial court's] clerk in preparation of these temporary orders" and asked, "All right?" No objection was voiced, and court was recessed.

A formal "ORDER/JUDGMENT" setting forth orders similar to the trial court's verbal announcements was entered on August 20, 2012, and both parties made their $500 deposit toward the "costs and fees" of

Mr. Moroni as ordered. The docket indicates that during a later case review hearing, the case was set for a bench trial in February 2013 "[b]y agreement of the parties[.]"

### The Second Hearing

In February 2013, the trial court called the case for the presentation of exhibits and additional testimony ("the second hearing"). Grandmother and Mother each testified again. The court called Ms. Lape as a witness. Mother called Mr. Moroni as a witness. Mr. Moroni, as Child's attorney, recalled Grandmother to the stand, and he also called Mr. Davis as a witness. Mother testified again in rebuttal.

At the time of the second hearing, Brother was in a court-ordered facility "because of multiple ongoing violations of his earlier probation that he had been on for some time[.]" Mother agreed that Brother's violations occurred while he was under her care and that she could not control him. Mother said that Brother had been diagnosed as being "hyper manic" and that he suffered from "[p]ost traumatic stress syndrome." She indicated that Brother took medication for at least one of these conditions. Mother anticipated that Brother would return to her home upon his release from the treatment facility.

Mother also testified that one of her older children ["Older Brother"] also had "trouble with the law" while he was a juvenile and that now, as an adult, he was recently in trouble again. Mother's fourth child, also an adult at the time of both hearings, had not completed high school, although she was living with Mother during the time she was attending high school.

Mother also testified that the program Child had been enrolled in to monitor her progress ended when Child reached two

years of age.[7] Mother agreed that Grandmother wrote a letter to someone at that time expressing disappointment "after she was told they were going to stop services" for Child. Grandmother also followed up with "some e-mails" to the program.

Ms. Lape testified that SSI benefits for Child had been paid to Mother, but "they were not being used for [Child's] benefit as far as [Ms. Lape] could tell."[8] Ms. Lape contacted "social security" and requested that Grandmother become "payee." She gave Grandmother "permission to start a checking account for [Child] in her estate's name."

Ms. Lape investigated treatment options if Child returned to Arizona and learned that "Arizona's treatment may not be determined to be the same treatment that she's getting in Missouri." Further, if Child left treatment at KRCC, but subsequently returned to the program, "she would have to be put on a waiting list again before services could be started, and the waiting list is sometimes a very lengthy wait period. It could last for months."

Ms. Lape confirmed that Court's Exhibit ZZ "consists of two separate documents, the first being a report purported to be done by [her] on [the] date of October 18, 2012, [and] the second being ... handwritten ... [and] e-mail correspondence [from] the next day[.]" She testified that the report was "correct and accurate to the best of [her] ability when it was prepared and submitted[,]" and it was "correct and accurate" at the time of her testimony. Ms. Lape pointed out that the opinions stated in the report were not her own, but "[s]ome of the opinions are opinions of [Grandmother] or [Mother]" and that such opinions were "clearly denominated[.]" She also agreed that the report references "a six-inch binder with supporting documentation that has been prepared for the [trial c]ourt to substantiate the information in [the] report[.]" The information in the binder had also been provided to counsel for the parties.

When the trial court indicated that it would receive Ms. Lape's report, Mother's counsel stated that he had "received copies of the medical records and various other documents[,]" but he had not received the report. The trial court announced that it would "receive [the report] into evidence subject to the right of any party to file a supplemental objection to any portion of the report[.]" A recess was taken and the clerk was instructed to make a copy of the report for Mother's counsel. Exhibit ZZ was later received into evidence.[9]

By the time of the second hearing, Mother was no longer a loan officer; she was working nights as "an entertainer[,]" and she had returned to school. She testified that Uncle had "moved out and moved

---

7. At the first hearing, Mother had testified that this program lasted until Child turned three years of age.

8. Ms. Lape's direct testimony was presented through questioning by the trial court. No objection was voiced to the use of that procedure.

9. The trial court did announce that an email from a non-party contained in Exhibit ZZ was specifically excluded and would not be considered. None of the exhibits received into evidence have been filed or deposited with

this court. Mother includes purported copies of [Child's] Exhibit IV, [Child's] Exhibit V, and Court's Exhibit ZZ in her appendix. "The appendix is not part of the legal file or otherwise part of the record on appeal." *Bison Park Dev., LLC v. N. Am. Sav. Bank, F.S.B.*, 399 S.W.3d 877, 882 n. 7 (Mo.App. W.D.2013). Thus, we presume that they would support the trial court's judgment. *See Briar Rd., L.L.C. v. Lezah Stenger Homes, Inc.*, 321 S.W.3d 488, 492–93 (Mo.App.S.D.2010) (an exhibit that is not deposited with the court is presumed favorable to the judgment).

elsewhere[.]" Mother testified that she had contacted Child via Skype on a regular basis since the first hearing, but she had not been to visit Child in person because she had "three children in the state of Arizona"—two adult children and Brother, who was "incarcerated"—and she had "responsibilities to those children also."

Records collected as [Child's] Exhibit IV were shown to Mother, and she indicated that they addressed activities that were done when the nurse came to see Child before Child finished her initial program at age two. The records also included a letter from Grandmother expressing disappointment with the ending of that program. When the exhibit was offered during Mother's testimony, Mother's counsel objected to the admission of the exhibit on the basis that "[t]he documents are all hearsay." The court reserved its ruling on that objection.

Ms. Lape identified the records in [Child's] Exhibit IV as "the records that [she] received from Arizona that shows ... a program there that evaluated [Child] as an infant and through her years while she was there." Grandmother then identified certain portions of Child's Exhibit IV as a letter she had authored and emails she had gathered from others and sent to the therapy program. Grandmother testified that she had initially set up this therapy program, called "Mile Markers[,]" "through the Early Childhood Intervention Program of Arizona" by referring Child to it, and then someone from the program contacted Mother. Child's Exhibit IV was reoffered, and counsel for Mother objected that "just simply submitting the entirety of the letters at this time is objectionable because it's all hearsay evidence." The trial court overruled the objection, stating that it would "review the documents and glean from them the appropriate portions that are relevant."[10]

Although Mr. Moroni was called as a witness by Mother, he testified that his recommendation was that Grandmother's petition for guardianship be granted. He based his recommendation on the "time constraints on [Mother,]" Mother's inability to care for Child given Child's "serious health problems[,]" "and the problems with her other children that she has raised." Mr. Moroni also observed that Mother "ha[d] been unable to deal with [Brother's] problems that maybe did stem from [his] serious health concerns[,]" which led Mr. Moroni to believe that Mother "may also lack the ability to handle" Child's serious health problems. He agreed that "if [Child] didn't have these health problems that [his] recommendation would be that [Child] go back to [Mother.]"

In March 2013, the trial court entered the judgment Mother now timely appeals. The judgment found that Grandmother "met her burden of proof to show by clear and convincing evidence that ... [Mother] is unfit to take charge of [Child] as her natural guardian[,]" and it granted letters of guardianship and conservatorship to Grandmother.[11] The trial court also de-

10. Despite its gracious offer to do so, the trial court was not required to engage in such a task.

When a blanket objection is made to an entire offer of evidence, if any parts of the exhibit were admissible, the blanket objection should be overruled. *Allen v. St. Louis Pub. Serv. Co.*, 365 Mo. 677, 285 S.W.2d 663, 667 (1956). It is not the trial court's duty "to sift the wheat from the chaff, which is what the court would be required to do in order to rule on a blanket objection." *Crockett by Crockett v. Schlingman*, 741 S.W.2d 717, 718 (Mo.App.1987). *Friese v. Mallon*, 940 S.W.2d 37, 40 (Mo.App. E.D.1997).

11. We note that the trial court may have applied an unnecessarily heightened standard

nied Mother's petition for a child protection order against Grandmother. Other relevant findings of the trial court will be discussed in our analysis of Mother's points.

### Analysis

#### Point I—Continuation of Guardianship Hearing and Court's Additional Orders

■ Mother's first point contends that it "was an error of law" for the trial court to act "on its own initiative" to continue the guardianship hearing "and order the collection of [additional] evidence[.]" Mother also contends these actions "had the effect of removing the burden of proof from [Grandmother] and shifting the burden onto the trial court, contrary to law and without good cause." In support of her multifarious point, Mother first argues that "[t]he Court was without authority to appoint [Ms. Lape] as guardian and conservator ad litem[.]" Second, she argues that "[c]ontinuing the hearing and commissioning persons to collect evidence was beyond the scope of the Court's authority[.]"

Grandmother responds that Mother has failed to preserve Point I for our review because Mother did not "object to the trial court's *sua sponte* order to continue the hearing and appoint [Ms. Lape] as guardian and conservator ad litem[,]" and Mother did not object "to the trial court's spe-

cific order pursuant to [section 475.097] to make a report to the trial court regarding issues raised during" the first hearing. We agree.

■ Generally, we will not find a trial court in error on a matter never presented. In Missouri, an issue which is not presented or expressly decided by a trial court is not preserved for appellate review. An appellate court will not, on review, convict a lower court of error on an issue which was not put before it to decide.

*Zundel v. Bommarito,* 778 S.W.2d 954, 957 (Mo.App.E.D.1989). The purpose of this requirement is to "eliminate error by allowing the trial court to rule intelligently and to avoid 'the delay, expense, and hardship of an appeal and retrial.'" *Brown v. Brown,* 423 S.W.3d 784, 787–88 (Mo. banc 2014) (quoting *Pollard v. Whitener,* 965 S.W.2d 281, 288 (Mo.App.W.D.1998)), and citing Rule 78.09).

In addition to remaining silent when the rulings she now decries were made, Mother then affirmatively demonstrated her acquiescence by paying the ordered $500 deposit toward Mr. Moroni's costs and fees. And at a case review hearing, Mother agreed with the other parties that the case could be set for a bench trial in February 2013 (the second hearing), dur-

---

of proof to this cause of action. The applicable subsections of section 475.075 provide:

1. Except as otherwise provided in section 475.062, when a petition for the appointment of a guardian ad litem, guardian or conservator against any person, hereinafter referred to as the respondent, *is filed on grounds other than minority,* the court, if satisfied that there is good cause for the exercise of its jurisdiction, shall promptly set the petition for hearing.

. . . .

7. The petitioner has the *burden of proving incapacity, partial incapacity, disability, or partial disability* by clear and convincing evidence.

(Emphasis Added.)

Because guardianship for reason of minority is not included in the list of grounds set forth in section 475.075.7 that are subject to the heightened standard of proof of clear and convincing evidence, we presume that the usual standard of proof in civil cases—preponderance of the evidence—is the applicable standard.

ing which Mother presented additional evidence.

Point I fails.[12]

### Point II—Evidentiary Support for the Judgment

Mother's second point contends the trial court's finding that she was unfit to act as Child's guardian "is not supported by the evidence and is against the weight of the evidence" because the trial court did not "consider credible, uncontradicted evidence, considered inadmissible evidence and evidence that was not relevant to [Mother's] fitness, and ... the evidence and circumstances viewed as a whole demonstrated [Mother] was fit to be guardian over [Child]."

■ When the appropriate challenges are made, we may review two different error claims based on the nature of the evidence adduced at trial in a court-tried case: whether substantial evidence supported the trial court's judgment, and whether the judgment was against the weight of the evidence. *M.B.R.*, 404 S.W.3d at 392. The difference between these claims is significant.

[A]n against-the-weight-of-the-evidence challenge presupposes the threshold issue of the existence of substantial evidence supporting a proposition necessary to sustain a judgment, but, nevertheless, challenges the probative value of that evidence to induce belief in that proposition when viewed in the context of the entirety of the evidence before the trier of fact.

*Houston v. Crider*, 317 S.W.3d 178, 186 (Mo.App.S.D.2010).[13]

■ We first note that Mother's point is defective for failing to specifically identify the evidence she purports to challenge. Rule 84.04(d)(1)(A)-(C) requires that each point:

(A) identify the trial court ruling or action that the appellant challenges;

(B) state concisely the legal reasons for the appellant's claim of reversible error; and

(C) explain in summary fashion why, in the context of the case, those legal reasons support the claim of reversible error.

■ It is not enough to simply refer to "evidence" that the court failed to consider or state that the trial court considered "evidence" that was inadmissible or irrelevant. *See Rogers v. Hester*, 334 S.W.3d 528, 539 (Mo.App.S.D.2010) (dismissing a point that did "not state with particularity the testimony that [appellant] believes demonstrates the harm caused by

---

12. In her reply brief, Mother requests plain-error review. "Plain error review is rarely granted in civil cases." *Rush v. Senior Citizens Nursing Home Dist. of Ray Cnty.*, 212 S.W.3d 155, 162 (Mo.App.W.D.2006). While we have the discretion to review for plain error, *Young v. Young*, 59 S.W.3d 23, 27 (Mo. App.W.D.2001), we decline to exercise it here, where Mother voiced no complaint until she received a result that was not to her liking.

13. Combining these distinctly different challenges in a single point relied on is a violation of Rule 84.04 and constitutes grounds for dismissal. *In the Interest of J.A.R.*, 426 S.W.3d 624, 630 n. 10 (Mo. banc 2014) (claims that findings were "not supported by substantial evidence *and* were against the weight of the evidence ... need to be raised in two separate points relied on because they involve two distinct legal claims"); *Sauvain v. Acceptance Indemnity Ins. Co.*, 437 S.W.3d 296, 299 n. 1 (Mo.App.W.D.2014) ("against-the-weight of the evidence" and "not-supported-by-substantial evidence" challenges should be brought in separate points relied on and the failure to do so is cause for dismissal). While we do not condone the rule violation, we have chosen to exercise our discretion to review the substance of Mother's claims *ex gratia*.

the alleged error"). None of her specific evidentiary challenges were preserved for our review as they were not presented in Mother's points relied on. *See Shochet v. Allen*, 987 S.W.2d 516, 518 (Mo.App.E.D. 1999) ("[i]f a point does not set forth what trial court ruling is challenged, it does not preserve anything for review on appeal").

■ Mother's contention that the judgment is not supported by substantial evidence and is against the weight of the evidence cannot prevail because she: 1) asks this court to credit testimony that the trial court expressly discredited; and 2) ignores evidence favorable to the trial court's conclusion that Mother was unfit to care for Child.

Mother argues that the trial court erred in not "crediting" her testimony that she had worked with Child to learn skills; Child was meeting developmental milestones under her care; she took Child to all medical appointments and followed through on recommendations including obtaining immunizations; and Brother's problems were due to other factors.

In its judgment, the trial court acknowledged Mother's position that evidence established various matters including that she and Father "worked with [Child] to teach her how to perform such tasks [as] eating, rolling, and crawling"; Mother taught Child to walk; "[C]hild was released from AZ–EIP when she was two or three years old because she was meeting the milestones the program had set for her"; Mother took Child to "all her pediatric appointments and ensured she received her proper immunizations"; and Mother and her other children worked to help Child "further develop her motor skills." The trial court expressly stated that it was "unable to so find but instead finds such testimony to be self-serving statements of [Mother] and not credible."

The judgment also acknowledged Mother's position that evidence was presented that Brother's "problems were not due to lack of supervision" but were due to other factors, and "his behavior has drastically improved since [August 2012]." And the judgment acknowledged Mother's claim that evidence demonstrated that she was "unable to travel to Missouri to visit [Child] on ... occasions [other than July 2012 and the two court hearings] because she could not afford the travel costs or to miss days of work due to being a single mother." With regard to all of these matters, the trial court stated:

> The court is unable to so find but instead finds some of such testimony to be self-serving statements of [Mother] and other parts to be subjective conclusions not capable of objective ascertainment and all of which the court finds to be not credible nor does the court assign any significant weight to such testimony.

Mother relies on *Gamble v. Browning*, 277 S.W.3d 723, 729 (Mo.App.W.D.2008), to argue that her statements were not self-serving because "[a] self-serving statement is one made outside of court by a party in their own interest, and does not include testimony at trial." *Gamble* involved the exclusion of a videotape "on the basis that it contained hearsay and was self-serving." *Id* at 728. The Western District noted that the simple fact that a statement was self-serving did not make it inadmissible; rather, such a statement, when hearsay, was not admissible unless it met an exception to the hearsay rule. *Id.* at 728–29. The opinion does not suggest that a witness's testimony cannot be considered less credible because it is self-serving. Our review of the record convinces us that the trial court's use of the term "self-serving" in connection with Mother's testimony had nothing to do with its admissibility; instead, it was an explanation for why the

trial court either did not believe it or did not give it much weight.

Mother also relies on *Epperson v. Dir. of Revenue*, 841 S.W.2d 252, 255 (Mo.App. W.D.1992), for her assertion that we "need not defer to the trial court where the disputed question is not a matter of direct contradictions by different witnesses." *Epperson* is of no help to Mother for two reasons. First, "the *Epperson* court was not faced with an express finding that a witness was not credible[,]" and such a finding cannot be ignored. *In re Baby Girl P.*, 188 S.W.3d 6, 10 (Mo.App.W.D. 2006). But more importantly, our supreme court has made it clear that when a matter is contested, the trial court may "disbelieve any, all, or none of th[e] evidence[,]" *White*, 321 S.W.3d at 308, and this court is not to "re-evaluate testimony through its own perspective." *Id* at 309.

■ The issue of Mother's fitness to care for Child was contested, and the trial court was therefore free to' disregard some or all of Mother's testimony. As a result, any evidence unfavorable to the judgment is simply irrelevant in determining whether a judgment in favor of a party with the burden of proof is supported by substantial evidence. *See J.A.R.*, 2014 WL 1302499, at *5 ("conflicts in the evidence will be reviewed in the light most favorable to the trial court's judgment[,]" and the trial court "can believe all, part, or none of the testimony of any witness").

■ Mother alleges that the trial court erred in "consider[ing] evidence which was based solely on what was in the best interests of [Child] and was not probative of [Mother's] fitness." Specifically, Mother argues that the trial court erred in considering: 1) a lack of evidence "concerning [Mother's] insurance coverage for [Child] in Arizona"; 2) "consideration of [Child's] medical needs" including the possible interruption of her medical treatment; and

3) "the possibility [Child] may be 'exposed' to [Uncle.]" Although neither of Mother's points alleges that the trial court misapplied the law, we have chosen 'to review her claim, *ex gratia*. *See Eltiste v. Ford Motor Co.*, 167 S.W.3d 742, 756 (Mo.App. E.D.2005) (appellate court "need not consider errors raised for the first time in the argument portion of the brief that are not raised in the point relied on" but the issue could be discussed *ex gratia* ).

Mother correctly states that a guardianship determination cannot be based solely on the best interests of a child. "Under [section 475.030], a court must adjudge the natural parent unfit or find that he is unable or unwilling to care for the children before moving to the question of appointing a non-parent as guardian." *Cotton*, 977 S.W.2d at 265. In other words, for purposes of a guardianship determination under section 475.030.4(2), the question of a child's best interest is not reached unless the trial court has found the natural parent to be "unwilling, unable or adjudged unfit to assume the duties of guardianship[.]"

"The term 'unfit' is not defined in Missouri's guardianship statutes, but case law has defined the term broadly in the guardianship context[,]" *In re Moreau*, 18 S.W.3d 447, 450 (Mo.App.S.D.2000), and "courts are given considerable discretion in applying that term." *Estate of Williams*, 922 S.W.2d 422, 425 (Mo.App.S.D.1996). In *Williams*, we quoted from other jurisdictions' explanations of unfitness, including that " '[p]arental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being.' " *Id.* (quoting *Uhing v. Uhing*, 241 Neb. 368, 488 N.W.2d 366, 372 (1992)). " 'As applied to the relation of rational parents to their child, the

word usually although not necessarily imports something of moral delinquency. Unsuitability for any reason, apart from moral defects, may render a parent unfit for custody.'" *Id.* (quoting *Finney v. Finney,* 201. Kan. 263, 440 P.2d 608, 612 (1968)).

■ Here, the trial court specifically relied on other language from *Moreau,* 18 S.W.3d at 450–51 (quoting *Williams,* 922 S.W.2d at 425), which in turn came from *Lewis v. Lewis,* 154 Ga.App. 853, 269 S.E.2d 919, 921–22 (1980) (judgment vacated by *Carvalho v. Lewis,* 247 Ga. 94, 274 S.E.2d 471, 472 (1981)), stating,

> " '[I]n a contest between one or both parents and a third party "unfitness" must be shown by evidence and found to exist by the court, and that *it amounts to circumstances which justify the court in acting for the best interest and welfare of the minor....* In determining such unfitness the stability of the family life may be considered, the amount of care which the custodian will be able to provide for the children on a daily basis, the environment in which they will be brought up, including the presence of family and other interested persons, the efforts, if any, which were made by the parent during this long separation to furnish support to the children, both personal and financial, the mental health or illness of the proposed custodian, and so on.' "

(Emphasis added by *Moreau,* 18 S.W.3d at 450–51.) If this language suggests that a determination of parental unfitness may be made by comparing the relative merits of a natural parent with those of the proposed guardian, we must reject it.[14] Assuming, *arguendo,* that the trial court was under any such mistaken notion here, it would not be fatal to the judgment because substantial evidence supported the trial court's finding that Mother was unfit. *See In the Marriage of Ulmanis,* 23 S.W.3d 814, 819 (Mo.App.S.D.2000) ("if a trial court's ruling is correct, it will not be disturbed on appeal because the court may have given a wrong or insufficient reason for it").

■ "The decision whether a natural parent is unfit to have custody of his or her child must be based on existing conditions[,]" *Moreau,* 18 S.W.3d at 453, but the past may also illuminate the understanding of present conditions. *Id.* In addition to considering whether the parent has neglected the child, "[o]ther factors enter into the question of 'fitness.' " *Id.* at 451, 452. In *Moreau,* the trial court's other basis for finding the parent unfit was that the parent lacked an "independent ability 'to provide for the care, health and needs' of [the child]." *Id.* at 453.

Here, the testimony of Dr. Dallas provided substantial evidence that Child had very special medical needs that required professional and in-home therapy to preserve Child's ability to walk and to avoid

---

14. On review, the Georgia Supreme Court reached the same result as the lower court, but it also parted ways with the language at issue, stating:

> [W]e disagree with the Court of Appeals to the extent that it has implied that a trial judge in the exercise of his legal discretion may compare the relative merits of a parent to those of a third party. A finding of unfitness must center on the parent alone, that is, can the parent provide for the child sufficiently so that the government is not forced to step in and separate the child from the parent. A court is not allowed to terminate a parent's natural right because it has determined that the child might have better financial, educational, or even moral advantages elsewhere. *Chapin v. Cummings,* 191 Ga. 408, 12 S.E.2d 312 (1940). Only under compelling circumstances found to exist by clear and convincing proof may a court sever the parent-child custodial relationship.

*Carvalho,* 274 S.E.2d at 472.

the potentially fatal effects of a disease like pneumonia. One of the trial court's findings was that Mother "offer[ed] evidence that she has no private medical or dental insurance for [Child], but that [Child] will qualify for Arizona Medicaid. However, no evidence is offered to establish that those benefits will cover the services which have been prescribed by the medical providers."

The trial court also found that "Medicaid in Arizona" would have "to determine anew whether [Child] will qualify for the same or similar treatment services already being provided her in Missouri[,]" and Dr. Dallas "has warned that interruption in the continuation of [Child's] treatment regimen would impair [Child's] ability to maintain a high activity level which would be devastating for any child with [Child's diagnosis.]" The trial court further stated that such a decrease in activity would result in a "decline in overall function including the ability to walk independently as well as a consequent danger of respiratory infection and pneumonia which could be life threatening." Such evidence was not simply about who could provide Child with better health care; it was relevant to the necessary determination of whether Mother had the independent ability "to provide for the care, health and needs" of Child due to Child's significant medical problems. *Moreau*, 18 S.W.3d at 453.

▮ Mother also alleges that it was improper for the trial court to consider the possibility that Child would be "exposed" to Uncle because the allegations against Uncle were hearsay, speculative, and that "[a]t best, these issues relate to best interests of [Child] and as such are wholly irrelevant to [Mother's] fitness[.]" The

trial court found that it had "other concerns regarding [Child's] caretaking in Arizona which could expose her to [Uncle], against whom unresolved allegations of sexual abuse exist without substantiation[.]" [15] Mother gave the following testimony when questioned about this issue:

Q. When [Grandmother] informed you of the allegations against [Uncle] did you listen to the allegations?

A. I listened to her.

Q. And did you consider them?

A. I did not consider them. I have four children total. Not one child has made an allegation.

Q. Now when you say you didn't consider them, you mean you just didn't think there was any basis for the allegations?

A. I did not consider any basis for it at all.

Q. And you know [Uncle] well?

A. Yes, I do.

Q. I mean that's your brother?

A. It's my brother.

Q. You know him better than [Grandmother] knows him?

A. Yes, I do.

Q. So you'd know better whether or not something like that could have happened, correct?

A. Yep.

Q. And you determined that you didn't think that what allegedly happened did happen.

[no response given]

Mother testified in the first hearing that she still planned on having Uncle help care for Child. The trial court stated that its concern about Uncle was in addition to its

15. Even if Mother had properly challenged the trial court's admission of this evidence, we note that the trial court did not find that the allegation was true. The trial court's ap-

parent concern was that Mother's reaction to the allegation—whether true or false—was itself probative of Mother's fitness to act as Child's guardian.

concern about whether the other babysitter identified as a caregiver for Child would have the "skills or ability to deal with [Child's] medical challenges[.]" A reasonable inference from Mother's testimony is that she did not intend to determine whether the allegation against Uncle was true before permitting him to care for Child. The trial court did not err in considering this possibility in determining Mother's fitness to be Child's guardian.

Mother next argues that nine particular evidentiary matters were: "not supported by clear and convincing evidence[,]" "not supported by ... the evidence[,]" "contrary to the evidence at trial[,]" "against the weight of the evidence[,]" found by ignoring other evidence, "premised on false assumptions," or flawed by some combination of these deficiencies. Specifically, she takes issue with the trial court's findings regarding her: 1) failure to seek medical care for Child; 2) failure to participate in medical and educational consultations; 3) inadequate plan for Brother's supervision; 4) plan to have Brother and Child in the same home; 5) abdication of duty to Child after June 2011; 6) failure to attend to Child's dental needs; 7) failure to pay for medical and dental expenses; 8) fitness to act as guardian according to Mr. Moroni; and 9) reliance on a babysitter to care for Child. She then argues in the final subsection of her brief that "the evidence viewed as a whole showed [Mother] was fit to act as [Child's] guardian."

The trial court cited numerous reasons for its conclusion that "[Mother] is unfit to take charge of [Child] as her natural guardian[.]" One reason was that Mother "did not financially support [Child] any at all during those periods of time [Grandmother] had actual custody of [Child] before June, 2011 or thereafter while she was the payee of [Child's] SSI benefits[.]" The following substantial evidence supported

this finding. First, Mother admitted that she had contributed "none" of the SSI paid for Child's benefit for Child's support while Child was in Missouri, spending the money instead on things unrelated to Child. Additionally, Grandmother testified that she paid for Child's dental work in Missouri and paid for all of Child's special medical garments.

Another reason why the trial court found Mother unfit was "that except for occasional consent forms, [Mother] abdicated to [Grandmother] her duties to [Child] after June, 2011 in regard to provision of home, protection, medical care and education and thereafter maintained only infrequent contact with her without any excusable cause." The substantial evidence supporting this finding included Grandmother's testimony that while she agreed to care for Child during the summer in 2011 so that Mother could relocate her residence, Mother then asked Grandmother to keep Child and enroll her in school in Missouri.

Although Mother authorized that enrollment and cooperated in the provision of medical services for Child, she declined to come to Missouri when Child was having a diagnostic procedure even though Grandmother offered to pay for Mother's airline flight. Mother called Grandmother "at least once a week[,]" but she did not always talk to Child during these calls or ask about her, and she did not send Child birthday or Christmas cards. Mother did not visit Child while she was in Grandmother's care, except when she came back to get Child in July 2012, and when she came to court in August 2012 and February 2013. Her excuse for not visiting was that she had "three children in the state of Arizona."

While Grandmother agreed that Mother had made a dental appointment for Child in Arizona, Grandmother took her to a

dental appointment in Missouri, which revealed that Child had numerous cavities and a broken tooth. This took place after Grandmother had previously talked to Mother about Child's dental care after the first time Grandmother had taken Child to the dentist, and that visit had revealed numerous other cavities. Based upon this testimony, the trial court found that Mother was not paying adequate attention to Child's dental hygiene.

Grandmother testified that she was concerned about Child because she was weak and she "didn't move like other children[,]" but Mother's response was to reassure Grandmother that Child would "be fine." Mother's description of the program that Child was involved in up until age two seemed to be focused on monitoring Child's progress according to "milestones" every six to eight weeks instead of relying on a professional who would be actively administering Child's therapy or treatment. Child's problems were obvious enough to Grandmother that she used the summer 2011 visit as a chance to seek professional help for Child. The trial court could find from this testimony that Mother was not paying adequate attention to Child's special medical needs.

The trial court was "especially troubled by [Mother's] testimony that much of [Child's] care would necessarily have to be provided by a babysitter whom she identified but whose skills or ability to deal with [Child's] medical challenges was not addressed." At the very least, there was substantial evidence that Child would require a significant amount of caretaking by someone other than Mother, who testified that, at a minimum, she would require a babysitter during the night while she worked, and, again by her own testimony, the time she devoted to her other children—despite the fact that two of them were adults—was significant enough to keep her from visiting Child in Missouri. Indeed, one of the reasons Mother gave for not taking Child back at the end of the summer in 2011 was because she "wanted to make sure that [Brother] was taken care of and that he get straight, you know, everything get going straight with him."

The trial court was also

especially troubled by [Mother's] testimony that she intends to have [Brother] return to live in her home without addressing whether his behavioral and drug problems might endanger [Child's] safety and just how her proposed babysitter would be qualified or prepared to deal with [Brother's] interactions with [Child] in [Mother's] absence.

Although we find no testimony attributing drug problems to Brother, Mother has not provided us with the exhibits admitted at trial, and Mother testified at the second hearing that although she could not control Brother, Brother would be moving back into her home after he was released from a court-ordered facility. This testimony supported the trial court's "concern" that Mother would be unable to protect Child from the effects of Brother's behavior.

The aforementioned substantial evidence supported the trial court's conclusion that Mother had demonstrated an inability to provide for the care, health and needs of Child. *See Moreau,* 18 S.W.3d at 453. And despite receiving significant monetary benefits for Child, Mother did not spend those benefits on Child's care. Other than providing her consent, Mother was not involved in getting Child's condition diagnosed or getting her enrolled in services designed to meet her particular needs. At the time of the second hearing, Mother was still limiting her involvement with Child's needs based on her perceived obligations to her adult children, and she was planning on exposing Child to unsupervised contact with Brother—a child she

had admittedly been unable to control—by bringing him back into her home.

In support of Mother's final claim—that "the evidence viewed as a whole showed [Mother] was fit to act as [Child's] guardian"—Mother argues that she had provided a stable home to Child "from birth until June 2011"; she would have her afternoons free to care for Child; "almost all of [Child's] family lived in Arizona"; there was "good cause for not providing financial support" and she provided other support; and there was no evidence that Mother's health "would be detrimental to the care of [Child.]"

■■■■ To make a successful against-the-weight-of-the-evidence challenge, an appellant must:

(1) identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;

(2) identify all of the favorable evidence in the record supporting the existence of that proposition;

(3) identify the evidence in the record contrary to the belief of that proposition, resolving all conflicts in testimony in accordance with the trial court's credibility determinations, whether explicit or implicit; and,

(4) demonstrate why the favorable evidence, along with the reasonable inferences drawn from that evidence, is so lacking in probative value, when considered in the context of the totality of the evidence, that it fails to induce belief in that proposition.

*Houston,* 317 S.W.3d at 187. Mother correctly identifies the factual proposition at issue—whether the facts demonstrated that she was unfit to be Child's guardian—but she identifies only some of the evidence in the record that supports that proposition. For instance, she acknowledges that Grandmother "paid some medical expenses for [Child]" and that Mother "failed to provide financial support to [Child] after June 2011[.]" But she omits other material evidence favorable to that proposition, such as the evidence that she did not spend any of the governmental benefits provided for Child toward Child's care while Child was residing with Grandmother, that she did not visit Child on a regular basis, and that she intended to bring Brother back into the home with Child. The task of setting forth the evidence favorable to the challenged factual proposition is critical in presenting a claim that a judgment is against the weight of the evidence. *Houston,* 317 S.W.3d at 187, 189.

■■■■ Further, her argument does not acknowledge that the trial court explicitly found Mother's testimony not credible insofar as she testified that she adequately addressed Child's developmental problems early on, that Brother's behavior had improved, and that she was unable to visit Child due to costs of travel or work obligations. Mother's failure to acknowledge the trial court's absolute right to make credibility determinations is critical because in identifying evidence contrary to that supporting the factual proposition at issue, the challenger must "resolv[e] all conflicts in testimony in accordance with the trial court's credibility determinations, whether explicit or implicit[.]" *Id.* at 188. In other words, testimony found lacking in credibility cannot be considered in this type of challenge.

■■■■ An against-the-weight-of-the-evidence challenge is not an opportunity for an appellant to receive a new factual determination from a different court; it is a review of whether the facts as found by the trial court are simply insufficient to induce belief in the challenged proposition, and Mother has not demonstrated why the evidence favorable to the judgment here

lacks such probative value. "Without any of this analysis, [Mother]'s argument lacks any analytical or persuasive value." *J.A.R.*, 426 S.W.3d at 631 n. 12, 2014 WL 1302499, at *5 n. 12 (noting, in the context of a claim that a termination of parental rights judgment was not supported by substantial evidence, that a litigant must identify the evidence favorable to the finding and explain how the trial court could not have reasonably made the finding in view of that evidence).

Point II is also denied, and the judgment is affirmed.

JEFFREY W. BATES, P.J., and GARY W. LYNCH, J., concur.